TEXAS MIDLAND RAILROAD v. H. L. EDWARDS & COMPANY.

Decided July 1, 1909.

**1.—Railway—Agent—Compress Company.**

In an action against a railway company for the loss of cotton by fire, while on the platform of the compress company, evidence considered and held to support a finding that the compress company and its superintendent were agents of the railroad company in the matter of the delivery and receiving the cotton intended for immediate foreign shipment. Following Arthur v. Texas & P. Ry. Co., 204 U. S., 505.

**2.—Same—Delivery of Cotton for Shipment.**

In an action against a railway company for the loss of cotton by fire, while on the platform of a compress company, evidence considered and held to show that the cotton had been delivered to the railroad company for shipment at the time of the fire.

**3.—Same—Loss by Fire—Liability.**

Where the facts showed that the cotton destroyed by fire, while on the platform of a compress company, had been delivered to the railroad company for immediate transportation, its liability as common carrier had attached, though no bill of lading had been signed and delivered to the shipper at the time of the loss.

**4.—Same—Bill of Lading—Stipulation against Loss or Damage.**

Where the cotton had been delivered to the railway company for immediate transportation at the time of the loss by fire, but no bill of lading had been signed or delivered to the shipper, the liability of the railroad company did not arise on the bill of lading, but upon a delivery to the company for transportation, and the shipper was not bound by stipulations in the bill of lading relieving the carriers from liability for loss or damage by fire.

Error from the District Court of Kaufman County. Tried below before Hon. F. L. Hawkins.

*A. H. Dashiell* and *Ogden, Brooks & Napier,* for plaintiff in error. —The court erred in its conclusions of law, wherein the court concluded that W. H. Flowers was the agent of the defendant in receiving the 410 bales of cotton for shipment. In shipments of this character it is only after the railroad company has signed and delivered to the shipper bills of lading for cotton on the compress platform that the compress company becomes the agent of the railroad company. Arthur v. Texas & Pac. R. R. Co., 204 U. S., 505; Railway v. Knight, 122 U. S., 83; California Ins. Co. v. Compress Co., 133 U. S., 387-415; St. Louis Railway v. Commercial Ins. Co., 139 U. S., 238; Railway v. McFadden, 154 U. S., 155; Martin v. Railway Co., 19 S. W. Rep., 314; Mt. Vernon Co. v. Alabama G. S. R. Co., 8 So. Rep., 687.

If, as contended by defendant in error, the cotton had been delivered to and accepted by the plaintiff in error, then, under the allega-

tions and proof, the shipper was bound by all of the provisions of the bills of lading applying to the shipment. Arthur v. Texas & Pacific Ry., 204 U. S., 514; Cau v. Texas & Pacific Ry., 194 U. S., 427.

*Young & Adams* and *Cockrell, Gray & Thomas,* for defendant in error.

BOOKHOUT, ASSOCIATE JUSTICE.—This suit was brought by the defendant in error, H. L. Edwards & Company, in the District Court of Kaufman County, Texas, against the plaintiff in error, the Texas Midland Railroad, to recover the value of seventy-four bales of cotton which were, on the 19th day of December, 1901, destroyed by fire while situated on the compress platform of the Shippers' Warehouse and Compress Company, at Terrell, Texas. The plaintiff alleged that on the 18th and 19th days of December, 1901, the plaintiffs delivered to the defendant on its platform in the city of Terrell, Texas, three hundred and ten bales of cotton for immediate shipment by defendant to Liverpool, and one hundred bales of cotton for like immediate shipment to Havre. That said platform was the platform of the Shippers' Warehouse and Compress Company at Terrell, but the same adjoins the tracks of defendant, and said platforms were on said dates and for a long time theretofore had been the only platforms for the purpose of receiving and shipping cotton of all kinds owned or controlled by defendant in Terrell, and the same were the usual places for its receipt of cotton for shipment and the only place that defendant had for such purpose at such time, and it was defendant's universal custom to receive cotton for shipment on said platforms. That defendant received said cotton for immediate shipment and caused the same to be segregated and put in a place to itself, same being properly marked and tagged for shipment as aforesaid. That thereupon the plaintiffs prepared bills of lading for said cotton and said bills of lading were O. K.-ed by defendant's servants and agents, who checked said cotton and ascertained that it was there. That thereupon said bills of lading were handed to the station agent of defendant at 12 o'clock on the 19th and he was requested to sign the same. The said agent promised to sign said bills by two o'clock in the afternoon, but for some reason unknown to plaintiffs he failed and refused to sign the same at two o'clock, and for some hours thereafter, although demand was made of him that he sign same. That from said two o'clock until five o'clock the said station agent kept promising to sign said bills, but had not done so at about five o'clock, when a fire broke out upon said platform and destroyed 74 bales of plaintiffs' cotton which had been, as above alleged, delivered by it to defendant for shipment as aforesaid—sixty-nine out of the shipment for Liverpool and five out of the shipment for Havre. That after the destruction by fire plaintiffs still demanded of defendant that it sign and deliver them said bills of lading, but the agent then refused to do so. That plaintiffs had completed their delivery of said cotton to defendant, and had done all that they could do towards the shipment of same, and that defendant had received the same for shipment as a common carrier prior to its destruction by fire. The defendant answered by general demurrer, general denial, and specially answered,

alleging the facts why it claimed the plaintiffs ought not to recover. A trial resulted in a judgment for plaintiffs for $4,199.33, the value of the cotton burned, and defendant perfected a writ of error.

*Conclusions of fact.*—The cause was tried by the court without a jury and the court filed conclusions of fact, from which it appears: That in December, 1901, and for many years prior thereto, H. L. Edwards & Company had been buyers and exporters of cotton, and were represented at Terrell by Lucias Rash as their agent. That at the same time, and long prior thereto, the Texas Midland Railroad had been in the business of a common carrier of freight and passengers, and as such had been engaged in the transportation of cotton for foreign shipment. That the defendant company had no facilities at its depot for the reception of cotton for shipment, and all cotton intended for foreign shipment over its road, as well as over the Texas & Pacific Railroad, was delivered to the respective roads on the platform of the Shippers' Warehouse and Compress Company, the said railroads having spurs or sidetracks contiguous to said compress platform and on opposite sides thereof. That by the general custom and usual course of business dealing between the cotton shippers, the railroad and said compress company, which had prevailed for many years, all cotton, when intended for foreign shipment, was delivered on the compress platform; if the same was local cotton, that is, cotton which had been marketed from the wagons in the city of Terrell, the same was hauled from the cotton yards to the compress company's platform, and the management of said compress issued what was known as dray receipts for this local cotton as it was delivered at the compress. If the cotton intended for shipment was "localed in" from the non-compress points, it was delivered by the railroad so transporting it to Terrell to the compress platform, where it was taken charge of by the compress management for the owner of the cotton, said compress management issuing receipts, or tickets, for this cotton, and tagging the same in order that it could be identified. Whenever any exporter of cotton desired to ship the same, they would, after having collected the same upon the compress platform, as aforesaid, and determining over which railroad they would ship, usually prepare their own bills of lading as a matter of convenience, and take them to the superintendent of the compress, who would check up the cotton and see that it was all on the compress platform, and would take up the dray receipts and also the receipts for the "localed in" cotton, which was included in the bills of lading, and after said cotton was ascertained to be on the platform, would O. K. this bill of lading. The approval at that time of the bills of lading consisted of "O. K." signed by W. H. Flowers, who was superintendent of the compress. The bills of lading were left blank as to date, and after receiving the O. K. of the superintendent of the compress the shippers of the cotton or some one representing them would then take the bills of lading to the agent of the railroad over which the cotton was desired to be shipped, to be signed and dated by said agent.

There was an arrangement and agreement between the compress company and the Texas Midland Railroad that said company should

protect it in the way of insurance against the cotton delivered on the compress platform for shipment over said railroad. The said compress company in pursuance of this agreement carried a blanket policy of $15,000 for the protection of the Texas Midland Railroad, and if at any one time there was more cotton for shipment over the Texas Midland Railroad than this blanket policy covered, then by said arrangement and agreement the compress company took out short-term policies to cover their excess; and the railroad company would decline to sign the bills of lading until it was protected for the amount of cotton then on the compress for compression and shipment, until it was protected either by the blanket policy or short-term policies in addition thereto. The plaintiffs in this case were not a party to this arrangement between the compress company and the railroad; had nothing to do with the payment of the insurance premiums, and the policies were not taken out for the benefit of the plaintiffs or other shippers, but solely for the benefit of the railroad.

On the 19th day of December, 1901, and prior thereto, the defendant railroad had no receiving or checking clerk to receive and check the cotton received at the compress platform and intended for compression and shipment over its road, and by the custom and usage which had grown up at Terrell, W. H. Flowers, the manager or the superintendent of the compress company, performed this duty of receiving and checking clerk in the manner and under the course of dealing stated in these findings. The manager of the compress had requested the defendant company to place a checking clerk on the compress platform in order that the compress management might be relieved of this labor, but this the defendant railroad company declined to do, stating that they were willing to take the checking of said Flowers as to the cotton, and declined to place a receiving or checking clerk on the compress platform to do this work.

On the 19th day of December, 1901, H. L. Edwards & Company had placed on the compress platform 410 bales of cotton intended for shipment, after compression, to Liverpool, England, and Havre, France, over the defendant's railroad. Some of this cotton had been "localed in" from non-compress points, but most of it was local cotton which had been hauled from the cotton yards at Terrell to the compress platform. The bills of lading were prepared for this cotton by II. L. Edwards & Company, at Dallas, and sent to Rash, their agent, at Terrell, said bills of lading identifying the same in the usual way, and there presented to W. H. Flowers, the superintendent of the compress, who checked up the cotton and took up the dray receipts and receipts for the "localed in" cotton, and O. K.-ed the bills of lading in the usual way. This was done about 12 o'clock on this day. These bills of lading were then taken by a representative of the plaintiffs to G. W. Pence, agent of the defendant railroad, and the only person expressly authorized to sign bills of lading for it; but Pence, at this time, was not in the office. Later on his attention was called to the bills of lading, and after checking up the cotton as shown in the bills of lading with his insurance policies, found that he was some $3,000 short on insurance and declined to sign the same until the compress had taken out a short-term policy in addition to the blanket policy to

protect this excess. He telephoned to Flowers, and Flowers assured him that he would take out such short-term policies, after some controversy as to fixing the value of the cotton for insurance purposes, and said Pence commenced work on the bills of lading and duplicates thereof, preparing them for his signature when said insurance policies had been arranged. During the time the said Pence was working on said bills of lading he telephoned to Griffith, the insurance man, whom Flowers had informed Pence would cover the cotton by insurance, but Griffith was out of the office, but he was informed by some one in the office that the policies would be issued. That in O. K.-ing the said bills of lading said Flowers was acting for defendant. Pence continued to work on the bills of lading, preparatory to signing them when the insurance had been arranged to his satisfaction, but before this had been done a fire broke out on the compress platform and seventy-four bales of this cotton were destroyed. Pence had failed and declined so far, before the fire, to sign these bills on account of insurance, and after the fire he refused to sign same, though asked to do so by plaintiff. The insurance policies were not issued nor the bills signed, but were returned to plaintiffs, and were by them applied to a subsequent shipment of cotton. No complaint was made by the agent of the defendant company as to the checking of the cotton or O. K.-ing of the bills of lading by Flowers, and his only reason for not signing them was on account of the shortage of insurance.

By the general usage the owner of cotton would give shipping instructions in writing to the compress company, and no shipping instructions were given to the agent of the railroad after such instructions were given to the compress company, and the compress company marked and tagged the cotton which was already on the platform which had been "localed in," according to such shipping instructions; but the cotton which was hauled to the compress platform from the local cotton yards was marked for shipment when delivered to the compress. And this was the method pursued with reference to the 410 bales of cotton in question. After this cotton was delivered to the compress company with shipping instructions no further instructions were given, either to the compress management or to the railroad with reference to the cotton by the owners thereof, and they had nothing further to do with the cotton in furtherance of its transportation.

After the bills of lading had been O. K.-ed by Flowers and the cotton checked by him, and the owner of the cotton had presented these bills of lading to the agent of the defendant company with a request to sign them, there was nothing further the shipper could do in furtherance of the transportation of the cotton, and there was nothing further to be done to the cotton to prepare it for transportation except to compress the same.

Said Flowers was not employed by the railroad company directly to perform the duties either of receiving or checking clerk, but such duties as were performed by him in this regard grew out of and was a part of the usage and custom incident to the compression and shipment of cotton at Terrell.

The usages and customs with reference to receiving, checking, compressing and shipping all cotton as detailed in the foregoing findings

was the universal custom at the town of Terrell, not only between plaintiffs and defendant railroad, but between all other shippers and such railroad, and between all other shippers and the Texas & Pacific Railroad, and such usages and customs were carried out with reference to the 410 bales of cotton in question, up to the time of the fire; but the bills of lading were not signed nor the insurance to cover excess taken out, as heretofore shown in these findings.

The Shippers' Warehouse and Compress Company was a corporation duly incorporated under the general laws of the State of Texas, authorized to do business in Kaufman County, among other counties, and was on December 19, 1901, and for some time prior thereto, the owner of the cotton compress and its platform at Terrell, Texas, and was operating the same as a cotton compress.

Section 13 of the rules and regulations of the Railroad Commission, which was in force and effect at the time of the fire in question, provides as follows: "Sec. 13. When cotton is tendered to a railroad company upon a compress platform which is situated on the track of such railroad company, it shall be the duty of such railroad company to take charge of and receipt for such cotton in the same manner and on the same terms as it would receive and receipt for the cotton if tendered at its depot, platform or other place assigned by it for such transactions; provided, however, that the shipper or the compress company shall, in such cases, assume the additional risk of insurance involved by such act of the railroad company."

After the cotton was delivered to the compress for compression and shipment the owners of the cotton had nothing further to do with it with reference to loading the same into the cars of the defendant company; the agent of the railroad would ascertain from the management of the compress how many cars would be needed for cotton then on the platform ready for compression and shipment, and these cars would be placed upon the sidetrack of the defendant company alongside of the platform, and loaded by the compress people.

None of the cotton in question had been compressed at the time of the fire which consumed the 74 bales, but it was understood that such cotton was delivered for immediate shipment as soon as same could be compressed, shipping instructions having been given by the plaintiffs to the compress company.

*Conclusions of law.*—The controlling questions arising on the facts are: (1) Was the compress company the agent of the railroad company as to this cotton? (2) Was there a delivery of the cotton to the railroad? The facts show that the railroad company had no facilities at its depot for the reception of the cotton intended for foreign shipment, as this particular cotton was, that the cotton was delivered on the platform of the compress company and that the railroad maintained a spur-track out to the platform of the compress, and the usual custom and course of dealing between cotton shippers on the one hand and the compress company and the railroad on the other, was that all cotton intended for foreign shipment was delivered at the compress platform. By the rules and regulations of the Railroad Commission of Texas, it is made the duty of the railroad company, when cotton is

tendered to it upon a compress platform situated on its track, to take charge of and receipt for such cotton in the same manner and on the same terms it would receive and receipt for the cotton if tendered it at its depot platform or other place assigned by it for such transactions. It was shown that the plaintiffs had concentrated and delivered 410 bales of cotton on the platform of the compress for foreign shipment and had prepared bills of lading in proper form for the transportation of said cotton over appellant's railroad, and that W. H. Flowers, the superintendent of the compress company, had examined said bills of lading and ascertained that the cotton called for and included in said bills of lading was on the platform of the compress company and approved the same by marking the same "O. K." and signing his name thereto. That upon O. K.-ing the bills of lading he took up the receipt of the compress company issued to the draymen or whoever delivered the cotton to the compress. These bills of lading, after having been O. K.-ed by W. H. Flowers, were by plaintiffs' agent delivered to the agent of the railroad company to be by him, as was his custom upon receiving such bills of lading, dated and signed. He began work on the bills of lading preparatory to signing them, and after checking up the cotton, as shown in the bills of lading, with his insurance policies, found he was some $3,000 short on insurance, and declined to sign the same until the compress company took out a short-term policy in addition to its blanket policy for $15,000 then on the cotton. This refusal was based on an agreement between the compress company and the railroad company that the compress company should protect the railroad company in the way of insurance against the cotton delivered on the compress platform for shipment over said railroad, and that the railroad would decline to sign the bills of lading until it was protected for the amount of cotton then on the compress platform for compression and shipment, either by the blanket policy or short-term policies in addition thereto. The plaintiffs were not parties to this agreement and had nothing to do with it. Pence, the agent of the railroad company, telephoned Flowers, and after some controversy Flowers assured Pence that he would take out the additional short-term policy. During the time Pence telephoned the insurance agent, whom Flowers had informed him would issue the policy for additional insurance, but the agent was not in his office, but he was informed by some one in the office that the policy would be issued. Before the policy was issued, and while Pence was at work on the bills of lading, and before he had signed them, a fire occurred on its compress platform, which destroyed 74 bales of the cotton. The fact that the railroad company had no place to receive cotton intended for export shipment but the compress platform, that it had no employes for the handling of the cotton while on the platform, but accepted the O. K. of the superintendent of the compress as to the number of bales thereon and relied on the compress company's employes to load the cotton in its cars, tends strongly to show, in our opinion, that in these respects the compress company and its superintendent were the agents of the railroad. In a case where the facts were quite similar to those here existing, it was held by the Supreme Court of the United States that the issue as to whether or not the compress company was the

agent of the railroad company was raised by the evidence and should have been submitted to the jury, and a judgment rendered upon an instructed verdict, in favor of the railroad, was reversed and a new trial awarded. Arthur v. Texas & P. Ry. Co., 27 Supreme Ct. Rep., 338; 204 U. S., 505. On the authority of that case we hold that, under the evidence, the trial court did not err in his finding that the compress company and W. H. Flowers in the matter of the delivering and receiving of cotton were the agents of the railroad company.

Had there been a delivery of the cotton to the railroad company at the time of the fire? No bill of lading had been signed and delivered to plaintiffs at the time of the loss. But this fact is not the sole criterion as to liability on the part of the railroad. If the facts show a delivery of the cotton to the railroad for immediate transportation, then its liability as common carrier had attached. East Line & R. R. Ry. v. Hall, 64 Texas, 615; Gulf, C. & S. F. Ry. Co. v. Trawick, 80 Texas, 270; Ft. Worth & D. C. Ry. Co. v. Martin, 35 S. W., 21; Martin v. Texas & Pac. Ry. Co., 27 S. W., 267; Arthur v. Texas & P. Ry. Co., 204 U. S., 505. It is true that the cotton had not been compressed at the time of the fire, and this was necessary in foreign shipments, but it was understood that the cotton was delivered for immediate shipment as soon as it could be compressed, shipping instructions to that effect having been given the compress company. The compressing of the cotton and the loading of the same in the cars were matters to be performed by the compress company. The cotton was at the time of the fire which destroyed the 74 bales in the control of the railroad, and plaintiffs had done everything in their power to procure the signing of the bills of lading and the transportation of the cotton. The agent's refusal to sign the bills of lading grew out of a matter between the compress company and the railroad, to which plaintiffs were not parties and over which they had no control. The facts show a delivery of the cotton to the railroad for transportation prior to the fire.

It is contended by plaintiff in error that if the cotton had been delivered and accepted, then the shipper was bound by all the provisions of the bills of lading. The bills of lading which were O. K.-ed by W. H. Flowers contained a clause as follows: "No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto by causes beyond its control; or by floods or by fire; or by quarantine; or by riots, strikes, or stoppage of labor; or by leakage, breakage, chafing, loss in weight, changes in weather, heat, frost, wet or decay; or from any cause, if it be necessary or usual to carry such property upon open cars." This contention is not sustained. The bills of lading were not signed and had not become the contract of the parties. The liability of the railroad did not arise on the bills of lading, but upon a delivery of the cotton to the railroad for transportation.

Finding no reversible error in the record the judgment is affirmed.

*Affirmed.*

Writ of error refused.