GULF, C. & S. F. RY. CO. v. ANDERSON, CLAYTON & CO. (No. 8121.)

(Court of Civil Appeals of Texas. Dallas. April 19, 1919. Rehearing Denied May 31, 1919.)

1. CARRIERS ☞134 — ACTION FOR LOSS OF GOODS—AGENCY—EVIDENCE.

In an action against a railroad company for the value of cotton destroyed by fire after having been loaded into one of its cars from the platform of a cotton compress company, to whom shipping instructions over defendant's line had been given, and while search was being made for one more bale on the platform to make the shipment complete, evidence *held* to sustain a finding that the compress company was defendant's agent for receiving and loading the cotton.

2. CARRIERS ☞113—DELIVERY TO CARRIER— COMMENCEMENT OF LIABILITY FOR LOSS.

Where shippers having 100 bales of cotton on the platform of a compress company, which was the carrier's agent for shipment, gave orders for their shipment, and after 99 bales had been compressed, inspected, and loaded into two freight cars, a fire destroyed the 49 bales in the second car before the remaining bale could be found and before the bill of lading was signed, there was a sufficient delivery of the cotton to the carrier for transportation to make its liability as a carrier attach at the time of the fire.

3. CARRIERS ☞113—LOSS OF COTTON BEFORE ISSUANCE OF BILL OF LADING.

Where, after all except 1 of 100 bales of cotton to be shipped had been delivered on cars of the railroad company for shipment, part of the cotton so delivered was destroyed by fire, that the railroad company kept an inspector to inspect cotton shipments, and would not issue a bill of lading until the entire shipment had been inspected, will not exempt the company from liability for the loss by fire, as the issuance of a bill of lading is not the sole criterion for the carrier's liability.

Talbot, J., dissenting.

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by F. E. Anderson and others, composing the firm of Anderson, Clayton & Co., against the Gulf, Colorado & Santa Fé Railway Company. From a judgment for plaintiffs, defendant appeals. Affirmed.

Terry, Cavin & Mills, of Galveston, Lee, Lomax & Smith, of Ft. Worth, and E. M. Browder and Locke & Locke, all of Dallas, for appellant.

C. M. Smithdeal, of Dallas, for appellees.

TALBOT, J. F. E. Anderson, M. D. Anderson, W. L. Clayton, and B. Clayton, composing the firm of Anderson, Clayton & Co. brought this suit to recover from the appel-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

lant, Gulf, Colorado & Santa Fé Railway Company $1,881.56, with interest from February 19, 1915, as the value of 49 bales of cotton alleged to have been delivered to the appellant at Ballinger, Tex., on February 9, 1915, and accepted by it for transportation to Houston, Tex., and which it is alleged should have been delivered to the plaintiff at Houston, Tex., on February 19, 1915. The defendant answered by general demurrer and general denial. At the close of the evidence the plaintiff and defendant each requested a peremptory instruction. That of the defendant was refused, and that of the plaintiff was granted; and, on the verdict of the jury returned in accordance with the court's instruction, judgment was entered in favor of the plaintiffs for $2,147.46, being the principal and interest of the claim sued on at date of judgment, with interest thereon from November 9, 1917, at the rate of 6 per cent. per annum, and for all costs of suit. From this judgment defendant appealed to this court.

The following facts are deducible from the evidence:

The plaintiffs were a firm of cotton exporters, whose business was the purchase of cotton situate at compresses and the export of the same. Nicholson & Baker was a firm of what is known as f. o. b. buyers, whose business was the purchase of cotton at various interior points, the shipment or concentration of the same at compresses, and the sale of the same there to exporters. They resided at Ballinger, Tex., and the plaintiffs, Anderson, Clayton & Co., maintained a representative there, though the headquarters of the firm was at Oklahoma City, Okl. During the month of February, 1915, A. H. Carter was the representative and agent of plaintiffs, and engaged in buying cotton for them at Ballinger, Tex. About February 8, 1915, he bought from Nicholson & Baker 100 bales of cotton for plaintiffs. The cotton was then situated on the platform of the Texas Compress Company at Ballinger. Nicholson & Baker gave to plaintiffs an invoice for the 100 bales, in which the bales were specified by number. Plaintiffs received the samples for the bales of cotton accepted the invoice, and delivered a draft to be drawn by Nicholson & Baker on plaintiffs for the purchase price of the cotton, to which was to be attached a bill of lading from the defendant railway company, for the shipment of the 100 bales from Nicholson & Baker, Ballinger, Tex., to the order of Nicholson & Baker, Houston, Tex., with instructions to notify Anderson, Clayton & Co. The draft and its amount was based upon the weights and grades of the particular bales of cotton invoiced, as such weights and grades had been agreed upon.

On February 8, 1915, Nicholson & Baker delivered to the compress company shipping orders or instructions directing it to compress these 100 bales, mark them in a particular manner, and deliver them to the defendant for shipment, and at the same time deliver to A. H. Wiggle, the local freight agent of the defendant at Ballinger, a prepared bill of lading for signature by said freight agent, covering the 100 bales of cotton in question for shipment. The duties of Wiggle as local freight agent of the railway company were to receive and deliver freight of all kinds, to issue receipts, bills of lading, "and such other work of like character." The bill of lading prepared by Nicholson & Baker, and delivered to Wiggle, the defendant's agent, covering the 100 bales in question, was not signed and issued by him because, when it was presented, inspection of all the 100 bales of cotton had not been made in behalf of the defendant. The Western Weighing & Inspection Bureau was the agent of the defendant for inspecting cotton at different compress points in Texas, and J. H. Day was its inspector at Ballinger. The defendant would not accept cotton for shipment, and issue bills of lading for the shipment thereof, at Ballinger, until after the cotton was inspected by the Western Weighing & Inspection Bureau's inspector, J. H. Day. Mr Day's method of inspecting cotton, which was pursued in this instance, was to stand at the door of the railroad car as the cotton was being loaded and pass on each bale as it went into the car. The loading of the 100 bales bought by plaintiffs from Nicholson & Baker was begun, and 50 bales of the same, the usual number put into a car, were put into one car, and 49 bales into another car, of the defendant. The car containing the 50 bales which was completely loaded was switched by the defendant railway company from the track alongside the compress platform to a different track in the yard, so as to make room for other cars. The car into which the 49 bales had been put remained on the railroad track alongside the compress platform, open and awaiting the remaining bale expected to complete the shipment. The 99 bales put into the cars had been compressed, marked and inspected. This was the situation on the afternoon of February 9, 1915, and about 3:30 o'clock of that afternoon a fire broke out on the platform of the compress company, spread over its plant and to the car into which the 49 bales of cotton in question had been loaded, standing alongside said platform, and destroyed the same. At the time of the fire the hundredth bale had not been found. It was among about 8,000 or 9,000 bales of cotton on the compress platform, and the compress company, before and at the time of the fire, had three or four men trying to locate it, but they had not been able to do so. This bale had not been compressed, marked, or inspected.

' There was testimony to the effect that, before the defendant railway company would is-

sue a bill of lading for the shipment of cotton, it required the compress company to issue what is known as a "compress clearance" certifying that the shippers had instructed a certain number of bales of cotton to be marked, compressed, and delivered to the railway company. This "clearance," according to the testimony of the superintendent of the compress company, is a notification to the railway company that the cotton is in the possession of the compress company and ready to be shipped, and all that remains to be done is to have the cotton inspected by the Western Weighing & Inspection Bureau. A. H. Carter, agent of appellees, testified that it was the custom of the railroad company to accept cotton for shipment on the compress platform at Ballinger. There was also testimony to the effect that the compress company loaded the cotton for the railway company and received therefor 2 cents a bale. The agent of the defendant had not signed any bill of lading prior to the fire, because, though he had received a report of inspection of one loaded car, containing 50 bales of the 100 bales of cotton to be shipped, he had received no report concerning the remaining bales, because the car containing the 49 bales needed another bale to complete the loading of the same and the shipment. Neither Nicholson & Baker, nor A. H. Carter, the representative of plaintiffs, nor the compress company on their behalf, made any request of the defendant railway company to proceed with the shipment of the 99 bales of cotton, or to issue any bill of lading for the 99 bales, until after the fire which destroyed the 49 bales, and neither the representative of the Western Weighing & Inspection Bureau nor the agent of the defendant had any information that the shipment was to be of any quantity less than 100 bales, or that that there was a desire to forward any part of the shipment until the whole was ready. The draft received by Nicholson & Baker from A. H. Carter, agent for plaintiffs, covering the 100 bales, would not have been honored, unless accompanied by a bill of lading for 100 bales of cotton issued by defendant, and they did not have a bill of lading covering 100 bales. Not having a bill of lading covering 100 bales of cotton, the draft originally issued was not collected by Nicholson & Baker, and they did not attempt to collect it.

After the fire and destruction of the 49 bales of cotton, and on February 10, 1915, the local freight agent of defendant at Ballinger, under instructions and by direction of its division freight agent, signed and delivered to Nicholson & Baker a bill of lading for the 99 bales of cotton, 50 of which had been loaded in one car and 49 in another, and Nicholson & Baker then returned to plaintiffs' representative, Carter, the draft originally issued for the 100 bales, which were ordered shipped, and received in its place and stead a draft for the 99 bales covered by the bill of lading issued by defendant's local freight agent under instructions from the division freight agent. The bill of lading given for the 99 bales of cotton was dated February 9, 1915, but was signed and issued on February 10, 1915, and the local freight agent of defendant, who signed it, testified that he would not have issued this bill of lading, but for the instruction he received from the division freight agent, and that he had never before issued a bill of lading for property which had, in whole or in part, been destroyed by fire before the bill of lading was signed. This witness further testified that, so far as he knew, nothing more was to be done by the shipper in this case before the cotton would have been ready for shipment; that "there was no other place in Ballinger for compressed cotton to be loaded than the compress company's platform, but that the railway company did accept flat cotton on the railway company's regular depot platform." Upon this subject R. L. Bassett, superintendent of the Texas Compress Company, testified:

"The railroad company had no place, except the compress platform, for handling concentrated cotton."

At another place he said:

"The railroad company had another platform in Ballinger for shipment of cotton, and there was no reason, except additional expense to the shipper, why compressed cotton could not be shipped over the other platform."

He further testified:

"There was nothing else to be done to the 49 bales by the shipper to forward the shipment or prepare it for shipment, but the cotton could never go out until the shipment was finished. It was up to us to find the other bale, and if we could not find it the railroad would have refused to handle it, as the bill of lading called for 100 bales. I don't know whether the bill of lading had been signed, but presume it had been made out."

At the time in question J. S. Hershey, living at Galveston, Tex., was general freight agent of the defendant, and he testified without contradiction that the local freight agent of defendant at Ballinger and the division freight agent at Temple, Tex., got their instructions from him with reference to the reception of freight and the issuance of bills of lading, or from the department over which he (Hershey), as head of the freight department, had jurisdiction; that among the instructions given is item 15, Santa Fé System Circular 2249a, relating to handling of cotton, which is as follows:

"No receipt for cotton or cotton linters should be given to a shipper, or bill of lading signed, until the agent or his representative knows by

actual count and check that all of the cotton, properly marked as called for by receipt or bill of lading, has been received and placed on platform or other place designated by the agent, or in cars as directed by this company's agent. The inspection of cotton and cotton linters at Texas and Oklahoma compresses has been placed under the supervision of the Western Weighing & Inspection Bureau. Bills of lading covering these commodities must not be issued by you, except on inspection certificates of the bureau representative subject to the following instructions: Export, interstate, and international bills of lading will only be issued after the cotton has been compressed, inspected by a representative of the Western Weighing & Inspection Bureau, and either loaded into cars or placed in such position on compress platform as to enable careful inspection of the same as to condition."

He further testified that other instructions referring to the same thing are as follows:

"Bills of lading will not be signed until all the property is in the possession of the railroad company and under its actual control."

On cross-examination this witness said:

"If a man has said he has 100 bales of cotton, and when it comes to a show-down he has but 99, the agent would refuse to issue a bill of lading for 100 bales, but after receiving the 99 bales would issue a bill of lading for 99 bales, if it was acceptable to the shipper; that if they asked for a bill of lading for 99 bales that had actually been delivered and inspected, although his original tender was 100 bales, he would correct his request for 100 bales and bill of lading would be issued for 99."

J. H. Day, inspector, said that he inspected the 49 bales as they were being moved into the car, and that he accepted them on the track. The evidence fails to show any such negligence on the part of the appellant with respect to the origin of the fire or burning of the cotton as would render the appellant liable as warehouseman.

The only assignment of error presented in the brief is as follows:

"The court erred in the respect and for the reasons stated in the ninth ground of this defendant's objections to the action of the court in peremptorily instructing the jury to find for plaintiffs, and declining to instruct the jury to return a verdict herein for the defendant, which ground was as follows, to wit: 'The defendant excepts to the action of the court in refusing its specially requested charge directing the jury to return a verdict in its favor; for that the undisputed evidence shows that the 49 bales sued for were delivered to the defendant on account of a single shipment of 100 bales of cotton and no less, and that one bale of such shipment had not been delivered to the defendant prior to the fire, and that such 49 bales, as well as 50 other bales, were held by the defendant awaiting the receipt of the remaining bale necessary to complete the shipment, and that the defendant's duty with reference to said cotton was that of a warehouseman only, and not of a carrier, and for that it is neither alleged nor proved that the destruction of the cotton was due to any negligence of the defendant."

The charge requested by the defendant and refused by the court simply directed the jury to return a verdict for the defendant. The charge given by the court at the request of the plaintiffs reads thus:

"The uncontradicted evidence in this case shows that the 49 bales of cotton in question were delivered by the plaintiffs to the defendant for transportation; that said cotton, after it was delivered to and accepted by said railway company for transportation, was destroyed by fire; that its value at the time it was destroyed was $1,835.50. Therefore you are instructed to return a verdict in favor of plaintiffs for the sum of $1,835.50, with 6 per cent. interest thereon from February 9, 1915, to date."

The question to be decided is whether or not, from the circumstances related, the defendant's duties as carrier, and therefore as absolute insurer, had attached. After asserting that appellee's suit is based upon the theory that 99 bales of cotton were delivered to and accepted by the railway company on February 9, 1915, before the fire, for transportation, whereby it became liable as an insurer for the 49 bales, which were destroyed by fire, appellant advances, as a complete answer to appellant's suit, the propositions that a railway company is not liable as an insurer of goods ordered shipped by it until the entire quantity so ordered to be shipped is delivered to and accepted by it for shipment; that the entire quantity so ordered to be shipped in this case was 100 bales of cotton, but at the time of the fire 1 bale of the same had not been located, marked, compressed, and inspected, and had neither been delivered to nor accepted by defendant; that possession by the compress company of the 100 bales of cotton, or any part thereof, was neither possession of, delivery to, nor acceptance by the defendant railway company. Appellee contends that, since the undisputed evidence shows that the shippers had done all that could be done by them to complete the delivery of the cotton to the defendant for transportation before the fire, the trial court properly instructed the jury to return a verdict in favor of appellees; that, the uncontradicted evidence showing that 49 bales of the cotton, for the value of which this suit was brought, were delivered, along with other cotton, to appellant as a common carrier, accepted by its inspector, and loaded into its cars, the court properly instructed a verdict for appellees; that the uncontradicted evidence showing that appellant's station agent, who was authorized to bind it, with full knowledge of all the facts, signed the bill of lading, admitting that the appellant had received the cotton as a common car-

rier; and that this was acted on by all the parties to the transaction—the court did not err in instructing a verdict for appellees.

[1-3] The conclusion reached by a majority of the court is that the judgment of the trial should be affirmed. The general rule contended for by appellant to the effect that a railway company is not liable as a common carrier and insurer of goods ordered to be shipped by it until the entire quantity so ordered to be shipped is delivered to and accepted by it for shipment is not denied, but recognized as well established. The view taken is that this rule or principle of law was fully met and satisfied by the undisputed evidence in the case. The 100 bales of cotton were on the compress company's platform, and that company had been instructed by the shippers to deliver the same to the defendant for transportation. The defendant had built railroad tracks alongside this platform for the purpose of enabling it to receive and load into its cars for shipment from said platform compressed cotton. It had been notified of the intended shipment of the 100 bales, had placed cars alongside the platform into which the cotton was to be loaded, and 99 bales had actually been loaded, before the fire occurred which destroyed tne 49 bales. This loading, as was the custom, was done by the compress company for the railway company, and for such service the compress company received its compensation from the railway company. The compress company, under the undisputed facts, was the agent of the defendant in the matter of delivering and loading the cotton, and, according to the testimony of the defendant's local agent and of the compress company's superintendent, nothing remained to be done by the shippers in furtherance of the shipment at the time of the fire. The evidence conclusively shows that the 100 bales had been put on the platform of the compress company, the only place at Ballinger where appellant received and accepted compressed cotton for shipment, and it is not denied that all of said cotton was on this platform and in the possession of the compress company at the time the shipping orders were given. The contention of appellant is that 1 bale of the lot had not been compressed, inspected, and delivered to it at the time the fire occurred, and therefore none of said cotton, notwithstanding 99 bales of the same had been inspected, accepted, and placed into its cars, and was in its custody as a common carrier. The evidence is, not that the 1 bale in question was not ready for delivery and inspection, but that it had not been discovered at the time of the fire, and, if misplaced or lost, it had been misplaced or lost by the compress nompany, which had been employed by appellant to do the loading of the shipment for it, and not through any act, want of care, or fault on the part of the shipper or his agent. It may well be asked:

"Wherein was the shipper responsible for the failure to find and load this bale? What could he have done, that he had not already done, to get it into the car? When he ordered the cotton shipped, he unquestionably meant to have it shipped immediately, and the same was then in the possession of the compress company, selected and employed by appellant to do the loading, and on the platform where appellant received and accepted compressed cotton for shipment. Mr. Day, the inspector, was not engaged by appellant to load, or have loaded, the shipments of cotton. His duty was simply to inspect and check shipments tendered to appellant. The 1 bale of the shipment here in question, which had not been found in the time of the fire, had not been inspected by him; but it does not appear that it was the fault of the shipper or his agent that this had not been done."

It seems manifest from the record that the 100 bales ordered shipped in this case had been accepted by appellant for transportation through its agent, the compress company, before the fire occurred which destroyed the 49 bales involved in this suit, and that it is inevitable that the appellant should be held liable for the destruction of said 49 bales. Therefore the contention of appellant to the effect that there is no evidence that the relation of agency existed between the compress company and the appellant, and that the compress company was acting for it in the matter of accepting and loading the shipment, is not supported by the record. That appellant kept on hand an inspector of its own selection to check and inspect shipments of cotton, and that there is evidence to the effect that it would not issue a bill of lading for a shipment until the same had been inspected by the inspector and reported by him to the railway station agent, may be admitted; but the issuance of a bill of lading is not the sole criterion of appellant's liability for the value of the cotton destroyed. "If the facts show a delivery of the cotton to the railroad for immediate transportation, as we believe they do, then its liability as common carrier had attached" at the time of the fire. Railway Co. v. Hall, 64 Tex. 615; Railway Co. v. Trawick, 80 Tex. 270, 15 S. W. 568, 18 S. W. 948; Railway Co. v. Martin, 12 Tex. Civ. App. 464, 35 S. W. 21; Railway Co. v. Edwards & Co., 56 Tex. Civ. App. 643, 121 S. W. 570; Arthur v. Railway Co., 204 U. S. 505, 27 Sup. Ct. 338, 51 L. Ed. 590. In the first case cited the Supreme Court said:

"The question was: Had the defendant accepted the cotton; not had all been done that ought to have preceded acceptance? If the defendant had taken control of the cotton and put its agents to preparing it for shipment, it had accepted the cotton."

In Railway Co. v. Edwards & Co., cited, as in the present case, the compressing of the cotton and the loading of the same in the cars were matters to be performed by the

compress company. This was necessary, and had not been done at the time of the fire which destroyed the 74 bales, for the value of which the suit was brought, and no bill of lading for the shipment had been issued. The cotton had been delivered to the compress company, and was on that company's platform to be compressed and shipped over the railway company's road. By the general usage the owner of cotton would give shipping instructions to the compress company, and no such instructions were given to the agent of the railroad after the instructions were given to the compress company. Before bills of lading were signed, the cotton was destroyed by fire while on the compress company's platform, and this court, speaking through Mr. Justice Bookhout, held that there was a delivery of the cotton to the railway company for transportation before the fire, and a writ of error was refused.

In the case at bar the facts show that the relation of agency existed between the compress company and the appellant, and that the compress company had possession of the one hundredth bale of cotton necessary to make the shipment ordered complete. These and other facts shown by the record establish beyond controversy the liability of appellant for the value of the cotton destroyed, and the judgment of the court below is affirmed.

Affirmed.

TALBOT, J., dissents.