## UNITED STATES FIRE INS. CO. OF NEW YORK v. ST. LOUIS, B. & M. RY. CO.*

### No. 9557.

Court of Civil Appeals of Texas. Galveston.
June 2, 1931.

Rehearing Denied June 25, 1931.

---

V. A. Collins, of Dallas, and S. H. German, and Baker, Botts, Andrews & Wharton, all of Houston, for appellant.

Andrews, Streetman, Logue & Mobley and Robert H. Kelley, all of Houston, for appellee.

LANE, J.

This suit was brought by the St. Louis, Brownsville & Mexico Railway Company, hereinafter called the railway company, against the United States Fire Insurance Company of New York, hereinafter called the insurance company, to recover the value of two certain lots of cotton, one of which is described as transit cotton, which was of the value of $29,996.84, and the other described as city cotton, which was of the value of $52,779.21, both of which were destroyed by fire.

The suit was brought upon a fire insurance policy issued by the insurance company to the railway company, the parts of which pertinent to the issues in controversy are: That it is for the sum of $500,000, and is known as a blanket policy covering cotton which might be destroyed by fire for the loss of which the railway company would be legally liable.

By Section 1 it is provided that:

"1. This company agrees to indemnify the assured for payments on account of their legal liability as common carriers, warehousemen, bailees or forwarders, except as hereinafter provided, for loss or damage by fire to cotton in bales, linters, grabbots and/or loose cotton in sacks."

The policy provides that it extends to and attaches to and covers the legal liability of the railway company at the Aransas Compress & Warehouse Company at Harlingen, Tex.; that the insurance company agrees to indemnify the railway company for payment on account of its legal liability for loss or damage by fire to cotton in bales, not in its possession as common carrier or warehouseman, while on the premises of Aransas Compress Company at Harlingen, Tex., and in or on streets, side tracks, sidewalks, cars, or platforms adjacent thereto. It further provides as follows:

"This Company agrees to indemnify the assured for payments on account of their legal liability as common carriers, warehousemen, bailees or forwarders, except as hereinafter provided, for loss or damage by fire to cotton in bales, linters, grabbots, and/or loose cotton in sacks.

"This insurance does not indemnify the assured on account of any loss or damage as follows:

"Cotton while in open or stock cars, at rest or in motion."

That the insurance covers cotton and cotton linters while on tracks, and other facilities leased, used, or operated by the railway company.

It further provides:

"It is understood and agreed that in respect to cotton under bills of lading at compresses, this policy does not cover the assured's liability for any cotton which is under the protection of any other policy of insurance, marine or fire (issued for the benefit of the assured), which would have applied if this policy had not been issued, and in the event of there being other insurance in force, it is understood that this policy shall not contribute therewith in the payment of any loss."

Again: "Other insurance permitted without notice until required."

Again: "This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if the insured now has or shall hereafter make or procure any other contract of insurance, whether valid or not, on property covered in whole or in part by this policy."

It is alleged and shown by the evidence that 241 bales of the burned cotton, known as "transit cotton," were covered by through bills of lading, which had been shipped from points other than Harlingen, but which had been stopped at the compress platform in Harlingen for unloading and compression. It is shown that 430 bales of the cotton, known as "city cotton," burned while on the compress platform at Harlingen, for which the railway company had issued its bill of lading, but, while each bale thereof was tagged and individually and distinctly marked as it came into the compress, and a record of each was kept so that when a shipment was ordered by the owner the compress could assemble the cotton by the use of such record, such bales of cotton were intermingled with other bales of cotton on the compress platform. When it was shown to the railway company, by a receipt of the compress company, that the compress company held for an owner a certain described lot of cotton, and such receipt was delivered to the railway company, it would, upon request of the owner, issue its bill of lading for such cotton, though it had not been assembled and formally marked for immediate shipment. It was alleged and shown that the "transit cotton" was in seven closed cars. Unloading slips were made out by the railway employees for six of said cars, which described the cars, showed the number of the bills of lading, date, point of origin, destination, number of bales, etc.; that these unloading slips were delivered to the compress

company so that the cotton might be unloaded and compressed while in transit; that said six cars were by the railway company set on the unloading track of the compress company, and at the usual place for unloading such cotton; the railway company kept a man on the yards whose duty it was to break the seals on the cars at the time the compress company began to unload same, and who assisted in checking the cotton out of the cars. As to these six cars, the railway company had done everything it could do or was required to do in order to deliver the cars into the custody and possession of the compress company, and the employee whose duty it was to break the seals was on the yards ready to break the seals on these cars when requested by the compress company to do so. The seventh car was placed on the track, as were the other six, and for the same purpose, about one hour before the fire occurred, but no unloading slip had been made out for it.

The insurance company answered by general demurrer, special exceptions, general denial, and specially alleged that there was no legal liability upon the railway company to make payment for loss of the cotton, in that the policy sued on contains a provision to the effect that the policy did not cover the assured's liability for any cotton under protection of any other policy of insurance issued for its benefit, and that as to the "transit cotton," it was covered by a policy issued by the Camden Company to the Aransas Compress Company for the benefit of the assured, and therefore such "transit cotton" was not under the protection of the policy sued on at the time it was burned, and that as to the "city cotton" burned on the compress platform, it had not been delivered to and accepted by the assured for immediate shipment as a common carrier, notwithstanding a bill of lading had been issued therefor by the assured; that the bills of lading issued for the "city cotton" were issued in accordance with rules and regulations of the Railroad Commission of Texas, which provided that in such cases the shipper or compress company should assume the additional risk of insurance involved by such act; therefore, there was no legal liability on the part of the assured, the railway company, to pay for "city cotton" burned on the compress platform.

The general demurrer and special exceptions of the insurance company were overruled by the court.

The case was tried by the court without a jury, and judgment was rendered for the railway company for $52,779.21 as the value of the "city cotton," and for $29,996.84 as the value of the "transit cotton." From such judgment, the insurance company has appealed.

Appellant's first proposition relates to the "transit cotton" only. It is insisted thereby

that the court erred in rendering judgment for appellee for the value of such cotton, because the undisputed evidence shows that at the time it was burned it was under the protection of another policy of insurance issued to Aransas Compress Company, for the benefit and account of appellee, by the Camden Fire Insurance Company of New Jersey, it being expressly stipulated and agreed by the terms of the policy sued on that it did not cover appellee's liability for any cotton under the protection of any other policy of insurance issued for the benefit of appellee.

■ The majority of this court sustains the above contention of appellant. We have already stated the facts shown by the undisputed evidence, which we hold clearly show that at the time the "transit cotton" was burned appellee was in such possession thereof as a common carrier as rendered it legally liable therefor.

The policy sued on by its provisions declares clearly and unambiguously that:

"It is understood and agreed that in respect to cotton under bills of lading at compresses, this policy does not cover the assured's liability for any cotton which is under the protection of any other policy of insurance, marine or fire, (issued for the benefit of the assured), which would have applied if this policy had not been issued, and in the event of there being other insurance in force, it is understood that this policy shall not contribute therewith in the payment of any loss."

At the time this cotton was burned, there was in force and effect an insurance policy of the Camden Fire Insurance Company of Camden, N. J., issued to the Aransas Compress Company of Harlingen (by which was meant the Aransas Compress & Warehouse Company), for the benefit of appellee, which policy contained, among other things, the following provision:

"For account of the Assured Aransas Compress Company this company agrees to indemnify the hereinafter named Transportation Line or Lines for payments on account of legal liability as common carriers or warehousemen for loss or damage by fire to cotton and/or cotton linters in bales under through bills of lading, originating at a place other than the compress of this assured and consigned to a destination beyond the compress of this Assured and stopped en route for the purpose of compression and re-shipment, only while in the custody of the assured and while contained in any of the buildings, sheds, platforms and/or yards on the hereinafter described premises of the assured, and in closed cars on side-tracks customarily used and available for loading and unloading at said compress."

That the policy just referred to was intended to cover "transit cotton" is apparent; and that the cotton in question was transit cotton is admitted.

■ We think it was clearly intended by all parties to each of the policies of insurance that such policies should protect the railway company for all cotton covered by its through bills of lading while the cars into which it was loaded were stopped en route for compression, that is, taken from its trains and placed at the compress that they might be unloaded and the cotton compressed.

It is contended by appellee that the section of the policy sued on, which we have quoted, cannot be called to the aid of appellant, for the reason that the taking of other insurance on "transit cotton" covered by the policy sued on is in one of its provisions allowed in the following words: "Other insurance permitted without notice until required."

We cannot agree to such contention, even if the section quoted by us stood alone. Such, however, is not a fact, as there is to be found in the policy the following provisions:

"This policy is made and accepted subject to the foregoing stipulations and conditions and to the following provisions and conditions printed on the back hereof."

On the back of the policy is this provision:

"This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void if the insured now has or shall hereafter make or procure any other contract of insurance, whether valid or not, on property covered in whole or in part by this policy."

■ It is apparent that the section of the policy sued on, relied upon by appellee as allowing other insurance, is so vague and uncertain as to render its meaning difficult, if not entirely incomprehensible. Therefore, those sections of the policy quoted by us providing for a release of liability if other insurance covered the cotton insured should prevail.

■ Where, as in this case, there are provisions in an instrument of writing which are in clear and decisive terms, they cannot be ignored or modified by another provision in the same instrument which is vague and uncertain in its terms. Such clearly expressed intention and terms will not yield to doubtful constructions in other parts of the instrument.

■ It is obvious from the policy as a whole that it was intended to prevent what is known as double insurance. The real purpose was not to permit but to prevent the coverage of the cotton by other or additional insurance.

For the reasons above expressed, so much of the judgment as awards to appellee $29,996.84 for the loss of the "transit cotton" is reversed, and judgment as to that item is here rendered for appellant.

We now return to a consideration of the issues relative to the "city cotton."

By its second and third propositions, appellant insists that the court erred in overruling its demurrer and its special exception No. 1, addressed to so much of the plaintiff's petition as relates to the "city cotton."

We have carefully read and considered the plaintiff's petition and also its trial amendment and, after having done so, we conclude that when the two are read together they are sufficient to present a cause of action and to fully advise the defendant of the nature of the same. We therefore overrule appellant's complaint of the action of the court in overruling its demurrer and special exception.

By its fourth proposition, appellant insists that the court erred in admitting certain evidence.

■ There is nothing in the record before us to show that any exception was taken to the admission of the evidence, the admission of which is complained of in the proposition; therefore, the proposition cannot be considered.

By its fifth proposition, appellant contends that the court erred in rendering judgment for appellee, the railway company, for the value of the "city cotton," as appellee, the plaintiff below, alleged that it was liable to the owner thereof for its loss on the ground that it had issued its bills of lading therefor at the time the cotton was burned and was therefore liable as a common carrier; that as a fact the cotton had not, at the time it was burned, been delivered to or received by appellee as a common carrier for immediate shipment; that, though such bills of lading had been issued at the time the cotton was burned, there were still certain acts necessary to be done by the shipper or the compress company, as the owners' agent, before complete control over the cotton could have passed to appellee railway company; that, such being the case, no legal liability rested upon appellee as a common carrier to pay for such cotton, and therefore the policy sued on did not cover such cotton.

We overrule appellant's contention. The "city cotton" was cotton placed upon the compress platform by numerous owners. When this cotton was so placed upon the platform, it was weighed by the compress, and an individual ticket was issued to the owner by the compress for each bale, showing a number corresponding to the number of a tag placed on the bale, the name of the owner, the name of the ginner who ginned it, and the gin number. The compress made and kept a record of the tickets it issued, so that each bale could be identified; the tickets mentioned were receipts of the compress company and given to the individual owner, showing the receipt of his cotton by the compress company. If any owner of cotton holding such receipt desired to ship his cotton over the railway of appellee, he would return to the compress company the receipt or receipts issued by it for the cotton which he desired to ship and furnish the compress company with a list of the bales of such cotton; upon the return of such receipts, the compress company would issue to the owner, the proposed shipper, a clearance receipt; upon delivery of such clearance receipt, which showed that the compress company held for the shipper certain described bales of cotton, by the shipper to the railway company, such company would, as it did in this case, issue to the shipper its bills of lading covering such bales; the "city cotton" involved in the present suit was at the time it was burned owned by one Sam Botts, who had purchased the same from various owners holding receipts of the compress company, which receipts were delivered to Botts, and which were by him delivered to the compress company in exchange for the clearance receipt above mentioned; after Botts got such clearance receipt, he delivered it to the appellee railway company. He then made out the bills of lading, which were issued to him by the railway company.

W. M. Hundley, local freight agent for the railway company at Harlingen, testified that the railway company takes these compress clearance receipts with the understanding that the compress is to compress and deliver the cotton to the railway company. The effect of his testimony, as we understand it, is that after the clearance receipts are delivered to the railway company and the bills of lading are issued to the owner, the railway company no longer depends upon the shipper to do anything further before the cotton is shipped, and that it accepts the compress company as its agent to see that the cotton is properly prepared for shipment. He testified as follows:

"*After the shipper gets the bill of lading he does not have anything more to do with the cotton.*" (Italics ours.)

Testifying further, he said:

"By the term 'city cotton' is meant cotton that is trucked into the compress from various gins in Harlingen and near-by points. In regard to the customary steps taken by our office, leading to the issuance of a bill of lading on city cotton which is going to be shipped out—we do not issue a bill of lading until we receive what we call a clearance from the compress company, which shows the name of the shipper, destination, the number of bales, marks and something like that. We will not issue a bill of lading until we had been furnished with a cotton clearance signed by the compress company. This group of papers which have just been exhibited to me are compress clearances, the kind we accept as authority for signing bills of lading."

It is shown that the railway company did not maintain a platform at Harlingen for handling cotton offered it for shipment; that

it had for a long time used the compress platform for such purpose, and would issue bills of lading for cotton on such platform.

■■ We think the evidence shows a state of facts which made the railway company legally liable for the "city cotton" after it issued its bills of lading therefor, and that the policy sued upon covered the same. There is no contention that such cotton was covered by any policy other than the one sued on. Upon the question of delivery, see Adoue v. Seeligson, 54 Tex. 593.

In Missouri, K. & T. R. Co. v. Union Insurance Co. (Tex. Civ. App.) 39 S. W. 975, 976, the question involved an insurance policy, one of its provisions being as follows:

"That the insurance company shall be liable on cotton in bales consigned to the compress company by the Missouri, Kansas & Texas Railway Company, a common carrier, for compressing or awaiting shipment."

In passing on the questions at issue in that case, the court said:

"The cotton in question, it is true, *was not delivered to the compress company by the carrier,* but was delivered to the compress company *by a shipper* who desired to ship over the appellant's road. *After the delivery* to the compress company of the cotton in question, bills of lading were issued by the appellant, covering the cotton, and *it was class-marked* as the cotton described in the bills of lading.

"We think the possession of the cotton by the compress company, holding it for the carrier, for the purpose of shipment, falls within that class of cotton covered by the contract of insurance; that *after bills of lading were issued* for the cotton, and it was designated as the cotton covered by the bills of lading, it was in the possession of the compress company *as agent for the carrier.* And we think the spirit and reason of the contract of insurance covers cotton of this class,—as much so as if it had been directly consigned and delivered to the compress company by the carrier." (Italics ours.)

■ There was no evidence tending to show that this "city cotton" was left with the compress company for storage after the bills of lading were issued, or that it was subject to further shipping orders, but the only reasonable inference to be drawn from the evidence is that the bills of lading were obtained by the shipper with the intent that his cotton should go forward to the consignee. The issuance of the bills of lading was, we think, prima facie proof that the cotton was delivered for immediate shipment, and there is not a scintilla of evidence to the contrary.

For the reasons expressed, so much of the judgment as is in favor of appellee for the sum of $29,996.84, the value of the "transit cotton," is reversed, and judgment as to that item is here rendered for appellant. The remainder of the judgment, except as to costs, however, remains undisturbed, and the same is affirmed.

Reversed, and rendered in part; affirmed in part.

PLEASANTS, C. J., concurs.

GRAVES, J. (dissenting).

The judgment of the trial court should have been affirmed in toto, it seems to me, for these two reasons: (1) Concededly, the policy sued on covered the 241 bales of "transit cotton" burned in cars on the premises of the compress company at Harlingen, unless at the time of the fire it was "under the protection of any other policy of insurance," and the Camden policy—solely depended upon as constituting that protection—did not do so, because, by its express terms as written, it applied to such transit cotton "only while in the custody of the assured," whereas this cotton, by what appears to have been the undisputed proof—at any rate from evidence of such force as requires the presumption of a finding to that effect below—had not been delivered by the railway company to the compress company (the assured), hence, never came into the custody of the latter at all; (2) the section of this policy providing: "Other insurance permitted without notice until required," expressly pleaded by the appellee as negativing the other recitation declared upon by appellant that it did "not cover the assured's liability for any cotton which is under the protection of any other policy of insurance," constituted such a direct contradiction in its terms as to nullify this last-quoted declaration, the evidence wholly failing to show that appellant ever during the life of the contract either required any notice affecting or interdicted the existence of other insurance.

The compress company at Harlingen—not the appellee railway company—was the assured named in the Camden policy, and that it was meant to cover such cotton as these 241 bales, which were still unloaded in closed cars at the former's customarily used platform for loading and unloading purposes, "only while in the custody of the assured" seems to me obvious from the text from it to that effect that is fully quoted in the majority opinion; so the inquiry is reduced to one of whether or not the custody of this cotton had in fact passed to the compress company at the time the fire occurred; on this feature, appellant's able counsel say, "so far as the matter of passing custody and control of the cars from the railway company to the compress company was concerned, everything necessary and requisite to be done had been done, and this court held:

"We think it was clearly intended by all parties to each of the policies of insurance that such policies should protect the Railway

124

Company for all cotton covered by its through bills of lading while the cars into which it was loaded were stopped en route for compression—that is, taken from its trains and placed at the compress that they might be unloaded and the cotton compressed."

The undisputed evidence appears to induce a conclusion directly to the contrary, that is, that the mere placing of the cars at the unloading platform to be unloaded did not of itself effect a change, in the custody of the cotton therein contained from the carrier to the compress company; the invariable course of dealing between the two companies with respect to the delivery of "transit cotton" by the railroad to the compress, which was pursued in this instance, was fully and uncontrovertedly stated by the local agents of both concerns in charge of that business for them to be, in material substance: When such cotton was received in the switchyards at Harlingen, the first thing done was for the railway company to make up from the waybills that had come in with the train "compress unloading-slips in duplicate, giving full reference on that slip, in order that the compress may know it is not for concentration, and it is checked out the same as any other cotton"; those slips would be taken and delivered to the compress company, the cars would be placed at its platform for that purpose, and then unloaded under a joint checking of the cotton as it came out by representatives of both companies, after which the compress superintendent would retain one of these slips, delivering the other one to the railroad agent, in that way only effecting a delivery of the cotton to and placing the custody of it in the compress company.

That indispensable process was not followed with reference to these seven cars of cotton, no such joint check had been made, the undisputed testimony being that, "none of the seals were broken on July 30 or 31, 1926, on any of these cars; those cars had not been unloaded and had not been checked, and the delivery receipt had not been executed by the Compress Company."

This state of facts differentiates the case thus made from Texas Midland R. R. v. H. L. Edwards & Co., 56 Tex. Civ. App. 643, 121 S. W. 570, 574, where the individual bales of cotton had been physically delivered upon the platform of the compress, that not only being the customary place for the receipt of all cotton intended for shipment over the railroad connecting with it, but the duty of receiving and checking it for the purpose also being—likewise in conformity to uniform custom—performed by the superintendent of the compress; wherefore, nothing remaining for the shipper to do in furtherance of the shipment, the court held: "The facts show a delivery of the cotton to the railroad for transportation prior to the fire"; here, on the other hand, there had by the uncontroverted tes-

timony been no delivery to the compress before the fire, because it yet remained for both it and the carrier to conduct the joint check that was necessary under their mutual and invariable method of handling the business to transfer the custody of the cotton from the railroad company to it.

The custom and habitual practice thus shown, in contemplation of which, it seems to me, the insurance company in this instance must be held to have contracted, make this case more nearly analogous to Morgan v. Dibble, 29 Tex. 107, 119, 94 Am. Dec. 264 in which the court said:

"The testimony in the record is to the effect, that by the usage of the trade goods were not regarded by the carrier or consignees as delivered until they were checked off by the agent of the former to the draymen. * * *

"The goods must also be tendered in a proper time and manner, as well as place, to relieve the carrier from responsibility. Hence it must be within business hours, and under such circumstances that the consignee may receive and put his goods away consistently with their safety. And it is the duty of the carrier to hold the goods in his custody until this may be done, and while he does so he continues to hold them under his responsibility as carrier."

See, also, Michigan Central R. Co. v. Mark Owen & Co., 256 U. S. 427, 41 S. Ct. 554, 65 L. Ed. 1032.

So, conformably with the quoted principle, I think this cotton, in the absence of its having been jointly "checked out the same as any other cotton," was at the time of this fire still held in the custody and under the responsibility as a carrier of the appellee.

That, indeed, is the majority view also, as this statement in the opinion discloses:

"We have already stated the facts shown by the undisputed evidence, which we hold clearly show that at the time the 'transit cotton' was burned appellee was in such possession thereof as a common carrier as rendered it legally liable therefor."

The appended judgment holding the Camden policy a bar notwithstanding, however, is clearly a non sequitur, when you construe it as covering this cotton "only while in the custody of the assured," as I think must be done.

As concerns the conflicting provision, "Other insurance permitted without notice until required," referred to as section 23 of appellant's policy, this comment in appellee's brief seems to me to be apropos:

"To say in one breath that other insurance is permitted without notice, and in the next that if other insurance is taken, the present insurance will be ipso facto annulled, seems to us so clear a contradiction as to require no argument or exposition."

If, standing alone, it needs any clarification at all, that is plainly supplied by other portions of the policy's context as a whole, where the possible coexistence of other insurance in indicated contingencies is not only recognized, but this requirement of notice from the insured to the insurer about it is amplified by specifying that an inventory of it be furnished.

It may be conceded that the objective of the conflicting provision, if standing alone, would be to prevent double insurance, but when, as here, it is left standing side by side with another of equal dignity, explicity permitting such a duplication so long as the insurer did not require the information about it exacted in other instances, I cannot see that it must be given that effect vel non.

This dissent from only so much of this court's judgment as reversed any part of that rendered below is respectfully entered.