## WICHITA VALLEY RY. CO. v. GOLDEN et al. (No. 1508.)

(Court of Civil Appeals of Texas. Amarillo. March 26, 1919. Rehearing Denied April 30, 1919.)

1. CARRIERS ⬅140 — CARRIAGE OF GOODS— WAREHOUSEMAN AS CARRIER'S AGENT.

Where a railroad, in the absence of a warehouse building to protect cotton at its station, as required by Vernon's Sayles' Ann. Civ. St. 1914, art. 6589, unloaded cotton shipped over its road on the platform of a compress company, the compress company was the agent of the railroad, and not an independent warehouseman.

2. CARRIERS ⬅94(5)—CARRIAGE OF GOODS— REASONABLE TIME FOR REMOVAL—APPLICATION OF RULE.

The rule that, where there is no dispute about the material facts, the question of reasonable time in which the goods should have been removed from the carrier's warehouse by the consignee is one of law for the court has no application, where the consignees of the goods were bound by the custom of the railroad to make delivery at the warehouse of a compress company.

3. CARRIERS ⬅85 — CARRIAGE OF GOODS— NOTICE OF ARRIVAL.

Written notice to the consignee of goods from the carrier of their arrival is not necessary, where the consignee has actual notice of the fact.

4. CARRIERS ⬅85 — CARRIAGE OF GOODS— CUSTOM AS TO DELIVERY.

Consignees of cotton by rail were bound by the custom and usage of the railroad in making delivery of cotton at a compress company's warehouse.

5. CARRIERS ⬅140—CARRIAGE OF GOODS—LIABILITY AS WAREHOUSEMAN—STATUTE.

Where consignee of cotton shipped by rail did not intend to take it away, but to sell it to other dealers at destination, he cannot hold railroad to strict liability as carrier for cotton after due notice served on him that it had been unloaded at compress company's warehouse, when he fails to show any effort on his part to relieve the railroad of its responsibility; the railroad being liable for the cotton, under Vernon's Sayles' Ann. Civ. St. 1914, art. 712, only as a warehouseman.

6. CARRIERS ⬅142 — CARRIAGE OF GOODS— WAREHOUSEMAN AS AGENT.

Where a railroad, because it had no suitable warehouse of its own, unloaded cotton carried by it at a compress company's warehouse, and placed it in charge of the manager, the compress company was the agent of the railroad, and the negligence of its employés causing destruction of the cotton by fire is attributable to the railroad.

7. CARRIERS ⬅146 — CARRIAGE OF GOODS— DESTRUCTION OF COTTON IN WAREHOUSE— NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

In an action against a railroad for destruction of cotton carried by the road and stored on arrival with a compress company which was its agent, evidence held sufficient to sustain jury's finding that ordinary care was not used in protecting the cotton from fire.

Appeal from Baylor County Court; Nat G. Mitchell, Judge.

Suit by A. H. Golden and another against the Wichita Valley Railway Company. From judgment for plaintiffs, defendant appeals. Affirmed.

Thompson, Barwise, Wharton & Hiner and Alfred McKnight, all of Ft. Worth, and Dickson, Kenan & Newton, of Seymour, for appellant.

Bert King, of Wichita Falls, for appellees.

HALL, J. Appellees, A. H. Golden and J. T. Richeson, sued appellant railway company to recover the value of 10 bales of cotton alleged to have been burned in Seymour, Tex., on or about June 1, 1916, 3 of which bales had been shipped from Goree to Seymour, and 7 of them had been shipped from Bomarton over the line of appellant railway. It is further alleged that said cotton had been stored in the Seymour compress at the time of the fire, by which they were destroyed. The petition alleges that the cotton was shipped by A. H. Golden, billed to A. H. Golden, as consignee, and that the reasonable market value of the 10 bales was $701.85; that appellant so negligently and carelessly conducted its business in regard to said cotton that it was wholly lost to the plaintiffs. Appellees pleaded in the alternative that, if they should be mistaken in their right to recover of ap-

pellant as a carrier and insurer, and that appellees had reasonable time after the arrival of the cotton at Seymour and after notice of such arrival, appellant still owed them the duty to care for said cotton as a warehouseman, and that it failed to use such care and caution for the protection of the cotton. The specific acts of negligence as alleged are as follows:

"(a) That appellant held out to the public that it placed all cotton upon arrival at Seymour in the Seymour Compress & Ice Company, and carried a blanket policy of insurance covering every bale of cotton unloaded on said platform by appellants herein in favor of said railroad, and thereby the said compress company became, in effect, the agent of appellant, and that the acts of said compress company became the acts of appellant in so far as cotton stored on the docks of said compress company was concerned while still in possession of said railroad company.

"(b) That appellant was negligent through the manner as set out above, in that said cotton was unloaded and piled near a large number of bales that had the ties removed from them and allowed to fluff out and cover a great space on the platform, and that said loose bales contrary to ordinary usage of the compress, and contrary to all regulations for placing compressed cotton thereon, was allowed to remain overnight and from day to day in this loose condition, and that appellant knew this, and allowed appellant's train to run near said loose cotton, and near said dock upon which said cotton was stored, and at the time of the year when the winds were extremely high, and that fire might be blown many yards and catch said cotton, or that even a passer-by smoking might be near enough to set said cotton on fire, and, knowing these facts, appellant permitted said cotton to remain in said condition on the platform of said compress company.

"(c) That according to the custom and usage the said Seymour Compress Company should have kept a night watchman to look after and guard said cotton, and that it held out to the public that it would do so, and that it was the custom of said night watchman to make rounds every 30 minutes, and on the occasion in question the said night watchman made the rounds very quickly, and went out south of the engine house, where he could see none of the docks where the loose cotton was, thus deliberately placing himself in a position where he could not watch the docks, and there remained for 25 minutes until the fire was discovered, while if he had been exercising usual and ordinary care he would have been where he could have discovered the fire in time to have extinguished it, or to have removed appellee's cotton to a place of safety, all of which he negligently failed to do, to appellee's damage as alleged in the first count hereof."

The answer of appellant is made up of general and special exceptions, general and special denials, and in the fourth paragraph alleges that on May 31, 1916, it delivered the cotton in question to the Seymour Ice & Compress Company, which was the usual and customary place to deliver cotton upon ar-

rival at Seymour, consigned as was this cotton, and that thereby it fully discharged its duty by making delivery to appellees. In the fifth paragraph it is alleged that it was usual and customary, upon the arrival of cotton at Seymour, to deliver said cotton as this was delivered, and that appellees knew of such custom, and fully acquiesced therein, and that some time thereafter the said compress company's plant was destroyed by fire, destroying all of the cotton of appellees, and that according to the custom and practice said cotton was not in the possession of appellant, but was in the possession of appellees by reason of delivery as aforesaid; and, answering further, appellant alleges in that connection that if it is held not to be a complete delivery it was such a delivery as would excuse appellant from liability as a carrier, and would fix appellant's liability only as a warehouseman. In the sixth paragraph it is alleged that appellant had duly notified appellees that the cotton was at Seymour and at the place where it was then situated; that appellants acknowledged said notice, and knew said cotton was there in the compress, and was ready to be delivered to appellees at any time they were ready to accept it.

The case was submitted to a jury upon special issues, and judgment based upon the verdict was entered in appellees' favor in the sum of $701.85.

[1] The failure of the court to direct a verdict for appellant is made the basis of the first assignment of error. Under this assignment the first proposition is that when a shipment of cotton is delivered to an independent warehouseman when it is usual and customary to make delivery that way, and the consignee has knowledge of such custom and usage at the time the contract of shipment is made, and has actual knowledge that delivery has been made to such independent warehouseman, after arrival at destination, and has a reasonable opportunity to remove the shipment elsewhere if he desires, the carrier's liability ceases. There is no question of independent warehouseman in this case. No such position was assumed by the appellant in the trial court. By article 6589, Vernon's Sayles' Civil Statutes, appellant was required to erect at every station for the reception and delivery of freight suitable buildings to protect such freight from damages. A reasonable inference from the record is that in the absence of such a building having been erected by appellant at Seymour the cotton in question was unloaded upon the platform of the Seymour Compress & Ice Company. Under such circumstances the Seymour Compress Company & Ice Company was the agent of appellant, and not an independent warehouseman. The first question to be determined under the various

propositions presented is, Had appellant's liability as a carrier and insurer ended? We are not required to go beyond the testimony of appellee Golden to determine this question. He testified in substance that he went from Bomarton to Seymour on the afternoon of the 31st of May on other business, remaining overnight; that the next morning about 9 o'clock he went to appellant's depot, and asked the station agent if any cotton had arrived for him. The agent replied, "Yes, we have some cotton down here." He then asked him if it had been unloaded, and the agent replied that he did not know. Golden says he left the depot then and went up to the compress to see if the cotton had been unloaded, and there met a Mr. Baker, general manager of the compress, asking him if there was any cotton delivered there, and that Baker replied, "We have just unloaded it," or "It has just been unloaded." With Baker he looked around and found the cotton, and Baker called some of the employés of the compress company, had them to weigh it, and asked Golden if he had paid the freight. Golden replied that he had not; that Baker then rang up the station agent, and asked him if the freight had been paid, and turned to Golden and said, "The freight has not been paid on this cotton; I can't give you the receipts." He further says that Baker wrote out the weights of the several bales on a piece of paper, and gave it to him; that he left immediately to go up town, intending to return to Bomarton, but on account of his auto having left he did not get away until late in the afternoon. The cotton burned that night or early the next morning. He stated that his intention was to sell the cotton, and not to have it compressed; that he had been turning over most of his cotton to buyers in Seymour. He admits that it was the custom of appellant company to unload all cotton upon the platforms of the compress company; that he was familiar with the custom and had acquiesced in it; that the 3 bales shipped from Goree to Seymour were shipped on the 26th day of May, and the 7 bales on the following day; and that both shipments were made with the knowledge of the usage and custom of appellant to unload it at the compress. He says he did not offer to pay the freight to the agent, and did not even know what the freight was; that he had other cotton on the platform of the compress at that time, for which he had the receipt of the compress company, and that he was assembling cotton there for the purpose of the market. He stated that he had never paid any storage for any cotton he had ever placed there. He stated that he did not have his bill of lading with him, and would have had to return to Bomarton and back to Seymour before he could have delivered the bill of lading to the station agent; that the only notice he ever had of the arrival of the cotton was on the morning of May 31st, when he was at the depot and the compress platform; that the man to whom he sold his cotton always took care of the freight, but that this cotton had not been sold at that time. On that occasion he was not expecting to receive the cotton because he did not know that it had been shipped. This evidence is sufficient to show that appellee Golden had actual knowledge of the arrival of his cotton at destination, and that it was then in the possession of the compress company, which for the purposes of this case was appellant's warehouse. He made no demand for the cotton, and the testimony of appellant shows that it was not necessary for him to surrender the bill of lading in order to obtain possession of it. At any rate, appellant cannot be charged with the failure of Golden to have the bill of lading in his possession at the time he made inquiry of the station agent. If delivery had been demanded it is shown that appellant would have made it without the surrender of the bill of lading, and we must determine the rights of the parties as if no such demand was made.

[2-4] The first issue submitted to the jury is:

"Did the plaintiff A. H. Golden, after having acquired notice of the arrival at Seymour, Tex., of the 10 bales of cotton in controversy, have a reasonable time within which to accept and remove said cotton from the warehouse of the defendant railway company before the same was destroyed by fire?"

The jury answered this interrogatory in the negative. While the rule is announced that, where there is no dispute about the material facts, the question of reasonable time in which goods are to be removed by the consignee is one of law for the court (American Express Co. v. Duncan, 193 S. W. 413), we think the rule has no application here. Written notice of the arrival of the goods is not necessary where the consignee has actual notice of that fact. 4 R. C. L. 755, § 223. Appellees were bound by the custom and usage of appellants to make delivery of cotton at the compress. T. & P. Ry. Co. v. Coggin & Dunaway, 44 Tex. Civ. App. 423, 99 S. W. 1052; Loeb v. Wabash Ry. Co., 85 S. W. 118.

[5] That the notice was sufficient is beyond question, and that appellees are bound by the custom and usage is settled by Golden's own testimony. Golden testified that he did not intend to remove the cotton, but his purpose was to sell it to other buyers in Seymour, to whom he had previously sold his cotton, and whose duty it would have been to pay the freight and remove it. Golden testified that he remained in Seymour all day, and so far as the record shows he made

no effort to dispose of his cotton. Article 712, Vernon's Sayles' Civil Statutes, is:

"If the carrier at the point of destination shall use due diligence to notify the consignee, and the goods are not taken by the consignee, and have in consequence to be stored in the depots or warehouses of the common carriers, they shall thereafter only be liable as ware-housemen."

Since Golden did not intend to take the cotton away it is clear that he is not entitled to hold appellant to strict liability as ·a carrier after due notice served on him when he fails to show any effort on his part to relieve appellant of its responsibility. He knew the cotton was already in the warehouse.; he did not intend to pay the freight, and if he saw fit to exercise his option and permit it to remain there without removing it, or disposing of it to some one who would remove it, appellant cannot in fairness be held to a higher degree of care than that of warehouseman. We think this issue should not have been submitted.

[6] Under the second assignment it is contended that if the defendant is liable as a warehouseman then the burden is on the plaintiff to show that the defendant's negligence was the proximate or moving cause contributing to the burning of the ten bales of cotton in question, and that plaintiffs wholly failed .to discharge the burden. By its conduct in unloading the cotton at the compress, and placing it in care of ·the manager thereof, occasioned by its failure to have a suitable warehouse of its own, the compress company must be held to be the agent of appellant, and the negligence, if any, of the employés of the compress company is attributable to appellant.

[7] The record shows that there were about 100 bales of cotton cut open and lying around the platform; that the compress company had frequently had fires but had previously managed to put them out; that the 100 bales of cotton were lying east and north of the pressing machinery, a part of it being in the shed which was closed up at night.

Quillian, the night watchman, testified:

That the compress company had 12 clocks, distributed about over the platform, for checking their watchmen, but 3 of them were out of repair; that he was not in his usual place at the time the fire originated; that if he had been in his usual place instead of letting Ben (another employé) detain him he might have seen the fire a little sooner than he did; that "it was a pretty bad fire when I first saw it. The first thing I done when they said 'fire' I asked them if there was any hose there, and they said there was not anything except some little short hose to clean flues with. They did not have any hose for water at all. I don't know whether I was supposed to, know where those things were kept or not, because they had not been turned over to me. If I had had the hose and enough pressure there might have been some of the cotton saved, but it would have taken a good deal of water to save it. I couldn't say that I would have had trouble putting that fire out, because when you get cotton on fire it is mighty hard to put out. I have always thought that we would have saved the ice plant and might have saved some of the cotton. Cotton is slow fire when it is in bales. If I had discovered that fire earlier I don't think I could have saved the cotton, because it was opened up. We might have saved some of the cotton in the bales, but not all of it. It is a hard thing to put out."

Ben Kimmons, another employé, referring to watchman Quillian, said:

"Mr. Quillian could not, and neither could any of us, see the docks where the bales of cotton were, nor could either of us see the compress, nor anywhere near the place where the fire broke out, and Mr. Quillian had been there 20 or 25 minutes before the fire was discovered. It took him 5 or 10 minutes to go his rounds and punch his clocks. I went out after he had made his rounds, and asked him what time it was, and he said 5 minutes after 12. In my judgment it had been burning 15 or 20 minutes."

Baker, the manager of the compress, testified that they never opened bales of cotton and left them loose for more than 24 hours. Golden testified that this cotton was open on the dock at 9 o'clock a. m., of May 31st, and the jury were authorized to infer that the 100 bales, or a greater part of it, had been opened the day·before. No reason was shown why appellee's cotton was placed with or near the bales that had been torn open, and it was shown that the fire started amongst the open cotton. These facts we think are sufficient to sustain the finding of the jury that ordinary care was not exercised in protecting appellee's cotton.

The remaining assignments are overruled, and the judgment affirmed.