PAUL ADLER and Others, Plaintiffs, *v.* BUSH TERMINAL COMPANY and Others, Defendants.

Supreme Court, Special Term, Kings County, October 2, 1936.

*Greenhill & Greenhill* [*Joseph Greenhill, Simon Greenhill* and *Bernard J. Freedman* of counsel], for the plaintiffs.

*Powers, Kaplan & Berger* [*Abraham Kaplan* and *Moses Finesilver* of counsel], for the defendants.

CONWAY, J. The complaint substantially states that between August 31, 1934, and October 12, 1934, plaintiffs delivered to the defendant warehouse company certain merchandise for the purpose of storage; that the latter company accepted and agreed to keep the merchandise in consideration of a certain monthly storage

charge; that the merchandise was partially destroyed by fire on October 12, 1934; that demand has been made for the return of the merchandise; and that only a portion thereof has been returned, such portion itself being in a damaged condition.

Plaintiffs move herein to strike out the defenses which have been interposed.

The first defense relies upon a condition in the warehouse receipt to the effect that the storage of the merchandise is subject to all the terms and conditions recited in a document described as the " Standard Warehouse Terms and Conditions of the Company in effect on the date of this receipt on file in its office, 100 Broad Street, New York City, New York." Defendants further allege that, pursuant to section 10 (a) of the above document, " all goods are stored at the owner's risk of loss or damage by acts of God, civil or military authority, insurrection, riot, strikes, or enemies of the government; or by sprinkler leakage; or by flood, wind, storm, *fire*, moths, corruption, or depreciation by rats, mice, or other vermin." Defendants claim, therefore, that under the foregoing provision, the warehouse company, or its legal representatives, are exonerated from any liability to plaintiffs for damage occurring to their merchandise by reason of fire.

In support of the application to strike out this defense as sham, plaintiffs assert that section 10 (a) is not included within the above-mentioned " Standard Warehouse Terms and Conditions; " that, on the contrary, the foregoing exemption of liability clause is found in a separate document, entitled " Terms and Conditions formulated by this warehouse in interpretation of, and supplementary to, the Standard Contract Terms and Conditions."

A consideration of the documents in question substantiates plaintiffs' claim. There is nothing in the warehouse receipt which refers to, describes or identifies the " Terms and Conditions formulated by this warehouse in interpretation of, and supplementary to, the Standard Contract Terms and Conditions." It necessarily follows that plaintiffs are not bound by any provisions contained therein. In consequence, defendants may not invoke the exemption of liability clause in defense of the instant action.

Even if it were assumed, however, that a proper reference in the warehouse receipt had been made to the clause relieving the storage company from liability, nevertheless, under the allegations of the complaint, such fact would not present a sustainable bar to the instant action. My conclusion in this respect is predicated upon the provisions of section 91 of the General Business Law which, reasonably construed, prohibits the *absolute* exemption of a warehouseman from liability for its own negligent acts.

The fifth separate and distinct partial defense is subject to the same basic defect as found in the first defense. This defense alleges that defendants' liability was limited under a specific provision of the " Standard Warehouse Terms and Conditions," which document was referred to in the warehouse receipt, to a certain base storage rate. The difficulty with defendants' position in this regard, however, is that no reference to a limitation of liability is contained in the " Standard Warehouse Terms and Conditions." On the contrary, the provision relating to a limitation of liability is found in section 10 (a) of the document known as " Terms and Conditions formulated by this warehouse in interpretation of, and supplementary to, the Standard Contract Terms and Conditions." As pointed out in my discussion of the first defense, plaintiffs are not bound by any of the provisions of the foregoing document, since the document itself was not incorporated by reference in the warehouse receipt.

The second, third and fourth defenses may be considered collectively.

The second defense alleges that subsequent to the storage of the merchandise in defendants' warehouse, plaintiffs obtained fire insurance coverage for it; that subsequent to the alleged fire loss, plaintiffs made claim against the insurance carrier for the alleged loss; that thereafter plaintiffs received from the insurance carrier payment of their losses and damages equal to the amount herein sued for; and that by reason thereof there has been a full discharge of plaintiffs' claim.

The third defense, counterclaim and set-off set forth the foregoing allegations as the basis upon which to predicate an affirmative claim against the plaintiffs for the sums of money which the latter have received from the insurance carrier.

The fourth defense recites that the insurance company, upon making the aforesaid payments to the plaintiffs, has become subrogated to the rights of the latter. Upon such assumption, it is the defendants' contention that the insurance carrier, rather than the instant plaintiffs, is the proper party to prosecute this action.

For the purpose of disclosing that the last-mentioned defenses are sham, the affidavits which have been submitted by plaintiffs recite that the moneys received by plaintiffs from the insurance carrier were not actual payments on account of the loss, but, on the contrary, were loans made pursuant to the provisions of the contract between the insurance carrier and plaintiffs. Such contract, made with plaintiff Sirota, Rosen & Co., in so far as here material, reads:

" 23. It is understood and agreed that any loss or damage to the merchandise by reason of a peril insured hereunder and for which a carrier or bailee is liable that this Company nevertheless will advance to the assured *as a loan* the amount of such loss, same to be repayable only to the extent of any net recovery assured may make from any such carrier or bailee * * * and as security for such repayment, the assured hereunder hereby agrees to pledge * * * and * * * further agrees whenever requested by the assurers hereunder to enter and prosecute suit against such carrier, bailee * * * on said claim with all due diligence and at the expense and under the exclusive direction and control of the assurers hereunder."

A substantially similar provision is contained in the contract entered into between the plaintiff Adler, Coleman & Co. and the insurance carrier.

Agreements of the foregoing character have been expressly recognized and approved by the United States Supreme Court in *Luckenbach* v. *McCahan Sugar Refining Co.* (248 U. S. 139, 148; 39 S. Ct. 53, 55; 63 L. Ed. 170), and the recognition there given has been followed by the Appellate Term of this department in *Irvin-Warren Clothes, Inc.,* v. *Celler.** Stated the court by Mr. Justice BRANDEIS in the *Luckenbach* case: " Agreements of this nature have been a common practice in business for many years. * * * It is clear that if valid and enforced according to their terms, they accomplish the desired purpose. They supply the shipper promptly with money to the full extent of the indemnity or compensation to which he is entitled on account of the loss; and they preserve to the insurers the claim against the carrier to which by the general law of insurance, independently of special agreement, they would become subrogated upon payment by them of the loss." Further: " In consideration of securing them [the insurers] the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice."

As in the *Luckenbach* case, so here, the defendants insist that the transaction between the insurance carrier and the plaintiffs, while in terms a loan, was in substance an actual payment of insurance; and substantially they contend that " to treat it as if it were a loan, is to follow the letter of the agreement and to disregard the actual facts; and that to give it effect as a loan is to sanction fiction and subterfuge; " that it will be ascertained from a consideration of the testimony elicited from the plaintiffs during the course of

---

*No opinion for publication.

an examination before trial, which was heretofore conducted, that the true intention of the plaintiffs and of the insurance carrier was to effectuate *a payment in full settlement of the loss* and that the transfer of the moneys from the insurance carrier to the plaintiffs was not for the purpose *of creating a loan.*

I hold, however, that the foregoing contention is not supported by the testimony of those persons who appeared upon the examination before trial. The witness Louis P. Rocker, appearing on behalf of plaintiff Adler, Coleman & Co., testified as follows:

" Q. Now, how did you get the payment? A. Mr. Healy (representative of the insurance company) walked into our office and presented a check to me with a form to be signed. I took the check *and signed the form.*"

On behalf of plaintiff Sirota, Rosen & Co., one Nathan A. Rosen testified:

" Q. You never regarded it as a loan to your firm? It was a payment of a loss? A. We treated it on our books as the payment of a loss, yes; but with the condition that we knew that the American Equitable (the insurance carrier) reserved the rights to treat it as a loan and we always had that in mind.

" Q. When you say that they reserved the right, you never had any discussion with them except that they asked you to execute the form and mail it in to them? A. That's right.

" Q. *They left a form and you signed it* and mailed it to them? A. Yes."

The form which the plaintiffs executed, and which is referred to in the above examination, reads:

" Received from American Equitable Insurance Co. the sum of (the amount is here stated) dollars as a loan without interest, under policy * * *, repayable only in the event and to the extent that any net recovery is made by us from any person or persons * * * on account of loss by fire * * *.

" As security for such repayment, we hereby pledge to said American Insurance Company whatever recovery we may make, and deliver to it herewith all documents necessary to show our interest in said property and we hereby agree to promptly present claim and, if necessary, to commence, enter into and prosecute suit against such person or persons * * * through whose negligence the aforesaid loss was caused, or who may otherwise be responsible therefor, with all due diligence, in our own name, but at the expense of and under the exclusive direction and control of the said American Equitable Insurance Company."

It thus appears that when the plaintiffs executed the above form, upon receiving the moneys from the insurance carrier, they

definitely understood that they were to retain the moneys as a loan, repayable only in the event and to the extent that a recovery might be had from the wrongdoers.

As stated in *Lee* v. *Barrett* (82 Misc. 475, 478): "This form of receipt has been construed by numerous Federal authorities as being in the form of a loan and advancement to be recovered back, and does not subrogate the insurance company in place of the person to whom said money had been advanced or loaned. *It cannot be construed as a payment for the loss.*"

The motion is granted, with ten dollars costs.