## TEXAS & N. O. R. CO. v. J. KAHN & CO.
### No. 2176.

Court of Civil Appeals of Texas. Eastland.

Oct. 31, 1941.

Rehearing Denied Dec. 5, 1941.

Robertson, Leachman, Payne, Gardere & Lancaster, of Dallas, and Baker, Botts, Andrews & Wharton, of Houston, for appellant.

Thompson, Knight, Harris, Wright & Weisberg, of Dallas, for appellee.

LESLIE, Chief Justice.

J. Kahn & Company instituted this suit against the Texas & New Orleans Railroad Company for the recovery of damages for the loss of cotton destroyed by fire on the platform of the Kaufman Compress Company at Kaufman, Texas. The defendant answered by general demurrer, general denial and specially alleged that at the time of the fire the cotton was in the possession and control of

the owner or shipper through its agent, the compress company. The trial resulted in an instructed verdict and judgment in favor of the plaintiff against the Railroad Company. That company appeals, contending that the verdict and judgment is erroneous, and that a verdict should have been instructed in its own favor; that if the undisputed evidence did not warrant a verdict in its favor, then an issue of fact was raised requiring the court to submit the case to the jury. The parties will be referred to as in the trial court.

The defendant Railroad Company contends there is no liability on its part because the cotton had not been delivered to it so as to render it liable as a common carrier. It contends that the cotton (1) was in possession of the compress at the time it was destroyed by fire; (2) that the compress company had been selected by the shipper as its agent; (3) that the cotton was to be compressed, marked, counted and otherwise serviced by the compress for and on behalf of the shipper at whose expense and direction such services were to be rendered. That the cotton had not been so prepared for transportation and accepted by the defendant at the time of the fire.

In brief, the theory of the plaintiff's suit is that the cotton at the time it burned was in the possession of the compress company as the agent of defendant. The defendant asserts that at the time of the fire the compress was holding and handling the cotton as the agent of plaintiff or independent instrumentality.

 Since an instructed verdict was given in favor of the plaintiff our question is, Does the evidence conclusively establish the correctness of the plaintiff's theory? We proceed upon the theory that when delivery has not been made to the carrier, but, on the contrary, the evidence shows that the goods remained in the possession of the shipper or his agent after the signing and passing of the bills of lading, the carrier is not liable as such under the bill. The issuance of the bills of lading was prima facie proof that the cotton was delivered and accepted by defendant for immediate shipment. Missouri Pac. R. Co. v. McFadden, 154 U. S. 155, 14 S.Ct. 990, 38 L.Ed. 944; Gulf, C. & S. F. R. Co. v. Lowery, Tex.Civ. App., 155 S.W. 992; Brass v. Texarkana & Ft. S. Ry. Co., 110 Tex. 281, 218 S.W.

1040; Texarkana & Ft. S. R. Co. v. Brass, Tex.Com.App., 260 S.W. 828.

While it is undisputed that the bills of lading were issued and delivered by the defendant and the draft attached for the purchase price was forwarded through the banks and paid by the plaintiff, nevertheless additional facts and circumstances (now to be considered) are presented by this record.

The defendant (Railroad Company) introduced its Tariff No. 71-C, consisting of rules promulgated by the Railroad Commission for the government of carriers. One of its provisions is: "Item No. 280— Through shipments on which compression in transit and consolidation is desired.

"On shipments of cotton moving under through bills of lading from origin to destination which shipper desires compressed in transit and consolidated with other shipments at the compress points in order to obtain the benefit of through carload rate from point of origin the following rule will apply: (a) Standard compression must take place at the first standard compress and high density compression must take place at the first high density compress in either direction from the point of origin and will be at the expense of the shipper."

Paragraph (j) of said regulation is: "At points at which a cotton compress is in operation, cotton may be tendered to the carrier for compression and consolidation thereat under the provisions of these compression and consolidation rules; when satisfactory arrangements have been made between the shipper and the carrier, cotton may be tendered to the carrier upon compress platform, and it shall be the duty of the carrier to receipt for such cotton in the same manner and on the same terms as it would receive and receipt for cotton if tendered at its own depot platform at compress or non-compress points."

The Tariff further provides: "(b) 1. Bill of lading must bear the following notation: 'This shipment may be held at ——— (here insert the compress point as provided in paragraph (a) hereof) for not to exceed 20 days from date of this B/L for compression and consolidation under the provisions of Item 280, Texas-Louisiana Lines, Tariff No. 71-C, I.C.C. 382."

Pursuant to above regulations the bills of lading issued in the instant case contain these provisions: "This shipment may be held at Kaufman for not to exceed 20 days

from the date of B/L for compression and consolidation under provisions of Item 280 Tariff 71-C, I.C.C. 382."

Pertaining to duties and liabilities of railroads as common carriers, Art. 886, R.C.S. 1925 reads: "Railroad companies and other common carriers having depots and warehouses for storing goods shall be liable as warehousemen are at common law for goods and the care of the same stored at such depots or warehouses before the commencement of the trip or voyage on which said goods are to be transported. They shall be liable as common carriers from the commencement of the trip or voyage until the goods are delivered to the consignee at the point of destination. The trip or voyage shall be considered as having commenced from the time of the signing of the bill of lading, and the liability of the common carrier shall attach, as at common law, from and after such signing."

Article 6409, R.C.S.1925, reads: "* * * and in case of failure to do so [forwarding goods in order of receipt] they shall be liable for all loss occurring while the goods remain, and for all damage occasioned or in anywise resulting from delay; provided that the trip or voyage shall be considered as having commenced from the time of the signing of the bill of lading * * *."

Article 6393, id.: "Railroad companies shall erect at each depot, station, or place established by such company for the reception and delivery of freight, suitable buildings or enclosures to protect produce, goods, wares, and merchandise and freight of every description from damage by exposure to weather, stock or otherwise."

■ After a careful study of this record, we are of the opinion that the undisputed facts as a whole may be stated thus:

(1) The defendant Railroad Company issued its bills of lading acknowledging receipt of the cotton in question and agreed to transport the same to Houston subject only to the right to hold the shipment not to exceed 20 days for compression and consolidation pursuant to tariff provisions.

(2) At the same time it knew that under the rules and regulations of the Railroad Commission the shipper of the cotton had a legal right to tender the cotton to it as a carrier on the compress platform.

(3) At that time the Railroad also knew that it was its duty as a carrier, *when satisfactory arrangements had been made with the shipper,* to receive and receipt for such cotton at the compress in the same manner as if it had been tendered to it on its own platform.

(4) The Railroad Company knew that its issuance of the bills of lading would reflect acceptance of the cotton by it as a carrier.

(5) When it received the cotton and issued its bills of lading it knew that the cotton was not ready for shipment and would have to be compressed before actual shipment began as evidenced by its notation on the bills of lading that the cotton might be held for not to exceed 20 days for the purpose of compression and consolidation.

(6) The Railroad Company knew that the compress company on its (Railroad's) behalf would identify, count, weigh, and load the cotton into the car and had previously so done for an indefinite length of time.

(7) In the instant case, and at the time of the fire, the cotton in question was so identified and was located upon the platform of the compress company, and was covered at the time of its destruction by shipper's order bill of lading issued by defendant.

(8) The defendant Railroad maintained no appropriate platform for accepting cotton at Kaufman, but relied on the compress company to receive cotton for it and after receipt to identify, weigh, count and load the bales for and on behalf of the Railroad.

(9) After the issuance of bills of lading covering the cotton on the compress platform, a shipper of the cotton could not interfere with it or change its course or quantity in any way without surrendering the original bills of lading and obtaining new authorization from the Railroad.

(10) There was no dispute as to the value of the cotton, nor that it was destroyed while lying upon the compress platform waiting for or in process of being compressed.

(11) At time of fire, Kahn & Company was owner of the cotton, having purchased same on outbound bills of lading and in reliance thereon.

As to the Railroad's practice or course of dealing in accepting compress receipts, weights, count, check, etc. of cotton the defendant's agent, Martin, testified: "Q. So you are just willing to forego knowing whether or not you have the cotton there you give a bill of lading for? A. I will say we have never experienced any trouble in shipping instructions from the Kaufman Compress Company and have never found

it necessary to check the cotton." Further, "Q. You have carried away that cotton, issued your bills of lading, in this routine manner from time immemorial? A. Yes.

"Q. Approximately what percentage of your freight business in the fall of the year is cotton cargo at Kaufman, Texas? A. I would say about 75 percent."

Upon this state of the undisputed testimony, and in the light of the following authorities we are of the opinion that the trial court did not err in instructing a verdict for the plaintiff: St. Louis, B. & M. R. Co. v. United States Fire Ins. Co., Tex.Com.App., 60 S.W.2d 196; United States Fire Ins. Co. v. St. Louis, B. & M. R. Co., Tex.Civ.App., 41 S.W.2d 118; Gulf, C. & S. F. R. Co. v. D. S. Cage & Co., Tex.Civ.App., 174 S.W. 855; Arthur v. Texas & P. R. Co., 204 U.S. 505, 506, 27 S.Ct. 338, 51 L.Ed. 590; Texas Midland R. Co. v. H. L. Edwards & Co., 56 Tex.Civ.App. 643, 121 S.W. 570, writ refused; Missouri, K. & T. R. Co. v. Union Ins. Co., Tex.Civ.App., 39 S.W. 975; Wichita Valley R. Co. v. Golden, Tex.Civ. App., 211 S.W. 465; International & G. N. R. Co. v. Dimmitt County Pasture Co., 5 Tex.Civ.App. 186, 23 S.W. 754; Civil Statutes and Railroad Commission Rules above cited, and 8 Tex.Jur. 108.

█ The Railroad's contentions that the compress company was holding and handling the cotton at the time of the fire as the agent of the plaintiff (Kahn), or as an independent instrumentality, are based essentially on the proposition that the plaintiff gave certain instructions to the compress company concerning compressing, patching, etc., the cotton, and also paid for compressing and handling the same.

We do not believe such considerations (if granted) to be controlling or material in the disposition of this appeal, and the authorities justifying our conclusion on this feature of the case and on the testimony as a whole will now be discussed.

The opinion in St. Louis, B. & M. R. Co. v. United States Fire Ins. Co., Tex.Com. App., 60 S.W. 196, involved cotton destroyed on the platform of the Aransas Compress Company at Harlingen. There were two classes of cotton spoken of as "transit cotton" and "city cotton." We are here concerned with the "city cotton" which originated at Harlingen and which furnishes a state of facts in substance identical with those in the instant case.

In the St. Louis, B. & M. R. Co. case the cotton had been delivered to the compress company (an independent concern) by the shipper. In each case the compress company issued its receipt, identifying each bale of cotton delivered on its platform. In that case, as in this one, the cotton was customarily weighed by the compress company at the time of the delivery of the receipts therefor to the owner. Thereafter in the event the owner desired to ship his cotton he merely surrendered his compress receipts to the compress manager who in turn delivered to the shipper clearance receipts which enabled him to obtain bills of lading from the Railroad Company.

In the instant case, the owner, desiring to ship, presented his receipts to Shannon Jones, the manager of the Kaufman Compress Company, who telephoned the Railroad Company and caused the issuance of such bills of lading. Such bills in each case were issued prior to the fire and the cotton burned while on the platform awaiting compression and shipment.

In the St. Louis, B. & M. R. Co., case, the Railroad defended on the ground that "though such bills of lading had been issued at the time the cotton was burned, there were still certain acts necessary to be done by the shipper or the compress company, as the owners' agent, before complete control over the cotton could have passed to appellee railway company; that, such being the case, no legal liability rested upon appellee as a common carrier to pay for such cotton * * *." 41 S.W.2d 122. In the instant case, the railroad company alleged "on the contrary, (it) would show that said cotton was delivered * * * to the Kaufman Compress Company for compressing and handling before shipment, and said compressing and handling was done at the direction" of the shipper.

The evidence is undisputed that in each case the Railroad Company maintained no suitable depot or platform for accepting cotton for shipment, but customarily received all cotton at the compress platform. In the St. Louis, B. & M. R. Co. case, the Court of Civil Appeals and the Supreme Court, through the Commission of Appeals, held that "the evidence shows a state of facts which made the railway company legally liable for the 'city cotton' after it issued its bills of lading therefor."

The issues arising in that law suit were disposed of in an opinion by the Commis-

sion of Appeals in this clear and concise language [60 S.W.2d 200]:

"All members of the Court of Civil Appeals were in accord upon the proposition that defendant in error, under the terms of its policy, was liable to plaintiff in error for the loss of the city cotton. This cotton was stored on the compress platform in the name of the owner. Each bale was distinctly marked so that it could be located and segregated from other cotton when ready for shipment. The compress company had issued its clearance receipts for the city cotton and delivered the same to the shipper. The shipper in turn delivered these receipts to the railway company, who thereupon issued and delivered to the shipper its bill of lading covering the specific cotton described in such receipts. *From that time the shipper could exercise no dominion or control over this cotton.* It was held by the compress company as the agent for the railway company. Upon a very similar state of facts, the Supreme Court of the United States, in the case of Arthur v. Texas & Pacific R. Co., 204 U.S. 505, 27 S.Ct. 338, 343, 51 L.Ed. 590, held that the carrier was liable as such, and that the compress company which had not compressed the cotton at the time of the fire 'had the actual custody of the cotton as the agent of the railway company.' " (Italics ours.)

In the St. Louis B. & M. R. Co. case, the record is silent as to who paid for compression of the cotton. No opinion of either court indicated by whom the compression instructions were given. The defendant in the instant case says it has no quarrel with the Commission's holding in the St. Louis, B. & M. R. Co. case, but that a different conclusion should prevail here because the evidence shows that the plaintiff paid for compression and handling, and also shows that certain instructions were given by the plaintiff or appellee, in both of which respects the record in the St. Louis, B. & M. R. Co. case is silent.

These contentions by defendant, or Railroad Company, may best be appraised in the light of, or by, the opinion in *Gulf C. & S. F. R. Co. v. D. S. Cage & Co.*, Tex.Civ. App., 174 S.W. 855, 858. Cage & Co. instituted that suit against the GC & SF Ry. Co., the I & GN Ry. Co., and a third defendant to recover the alleged value of a carload of rice purchased by plaintiff from the Industrial Rice Milling Company, and by the latter delivered for shipment or switching to the I & GN Ry. Co. The In-

dustrial Rice Milling Company, at the request of the plaintiff (Cage) had loaded 190 sacks of rice (sold to plaintiff) on a railroad car standing on the Industrial track of the I & GN Ry. Co. at the warehouse of the Milling Company. The I & GN Ry. Co. was a separate and independent carrier from the GC & SF Ry. Co., and the I & GN Ry. Co.'s position in that transaction corresponded to that of the Kaufman Compress Company in the instant case. After loading the rice into the freight car located on the I & GN Ry. Company's industrial track, the seller or shipper (Milling Co.) applied to the GC & SF Ry. Co. for bill of lading for transportation of the rice to a point on the line of the GC & SF Ry. Co. The I & GN Ry. Co., as the switching railroad, received its instructions from the *shipper*. In fact, its rules forbade it to take shipping instructions from anyone except the shipper. For switching the car of rice from the Rice Milling Co. to the GC & SF Ry. Co. track, the I & GN Ry. Co. was to have been paid by the shipper a $2.00 switching charge. The car of rice burned before it was delivered by the I & GN Ry. Co. and at a time when it was more than two miles from the GC & SF Ry. Co. which had already issued its bill of lading covering the rice. Obviously, in that case there remained to be performed a service (switching, etc.) which was *ordered* and *paid for* by the *shipper*. In that case the GC & SF Ry. Co. defended on the ground it had not received the goods for shipment. That contention was overruled and the courts held that under the facts the GC & SF Ry. Co. was liable as a common carrier, stating its conclusions in part as follows:

"We think that, under the custom, the loading of the car and notice of [to] the owner [I & GN] of the industrial track to switch it to the line of the GC & SF Ry. Co. constituted the former the agent of the latter, especially after it promised to switch the car, as the evidence shows it did, and thereafter the issuance by the Santa Fé [GC & SF] of the bill of lading with full knowledge of the facts was tantamount to a delivery to and acceptance by the Santa Fé of the shipment, and it thereby became liable as an insurer, although the shipment was thereafter destroyed before coming into its actual possession. Revised Statutes 1911, art. 713; Missouri K. & T. R. Co. v. Union Ins. Co., [Tex.Civ.App.], 39 S.W. 975; Texas & P. R. Co. v. Nicholson, 61 Tex. [491], 495."

Article 713, R.C.S.1911, cited above, is now Art. 886, R.C.S.1925, set out in an earlier part of this opinion.

The opinion in the D.S. Cage case, supra, quotes at length from the opinion in Missouri, K. & T. R. Co. v. Union Ins. Co., Tex. Civ.App., 39 S.W. 975, 976. In the latter case, cotton in the possession of the compress was held to be in the custody of the carrier's agent and protected by a policy insuring cotton consigned to the compress by such carrier. In part, that opinion holds:

"The cotton in question, it is true, was not delivered to the compress company by the carrier, but was delivered to the compress company by a shipper who desired to ship over the appellant's road. After the delivery to the compress company of the cotton in question, bills of lading were issued by the appellant, covering the cotton, and it was class-marked as the cotton described in the bills of lading. We think the possession of the cotton by the compress company, holding it for the carrier, for the purpose of shipment, falls within that class of cotton covered by the contract of insurance; *that after bills of lading were issued for the cotton, and it was designated as the cotton covered by the bills of lading, it was in the possession of the compress company as agent for the carrier.*" (Italics ours.)

That opinion while recognizing that as a general rule a carrier would not be subject to the liability of an insurer without actual delivery, nevertheless held: " * * * this does not mean, in all instances, an actual delivery. It may mean such a delivery as the parties among themselves may agree upon as sufficient." Also, while recognizing that a bill of lading is not conclusive as to delivery and acceptance for transportation, the court said:

"It appears from the evidence that the custom and habit of dealing between the appellant and the compress company and the owners of the cotton that was delivered to the compress company for compression and shipment was that the cotton for which bills of lading were issued by the appellant, and which was designated and identified as the cotton mentioned and described in the bills of lading, should be regarded as then under the dominion and control of the carrier * * * although there was no actual delivery to the carrier on board its cars."

The facts there involved fit the situation presented by the instant case, and it cannot be denied that after the issuance and delivery of the bills of lading herein, the shipper, J. Kahn & Co., lost control of the cotton and could alter the shipping contract only by returning the bills of lading and obtaining the consent of the Railroad Company (appellant) who would then cancel the old bills of lading and issue new ones.

Certainly the opinion in the Cage case has an important bearing upon the proper disposition of this appeal. It deals with and disposes of the factors relied upon by appellant (Railroad Company) to distinguish the instant case from decisions which are believed to be very material, if not controlling, in the disposition of the instant one. The carrier issuing its bills of lading under the circumstances detailed was held liable, even though the Industrial track owner, the I&GN Ry. Co., (occupying the position of the Kaufman Compress Company), acted under shipping instructions from the *shipper,* at the *expense* of the *shipper,* and (at time of fire) still had to move the cargo of rice a distance of two miles to the track of the GC&SF Ry. Co.

Further, it is necessary to keep in mind that in the instant case the appellant Railroad Company issued its bills of lading strictly in accordance with its long established practice of dealing with shippers and the compress company concerning cotton deposited upon its platform for immediate shipment. It had no such platforms itself, maintained no employees at the compress platform and accepted in good faith and without qualification the clearance receipts and reports (by telephone and otherwise) given it by the manager of the Compress Company and relating to cotton there tendered to it for shipment over its lines.

As previously noticed, Martin, the defendant's agent at Kaufman at the time of the fire, and who issued the bills of lading, testified he issued "bills of lading in this routine manner from time immemorial * * * we have never experienced any trouble in shipping instructions from the Kaufman Compress Company and have never found it necessary to check the cotton."

There is great similarity in the facts involved and the issues of law arising in

this case and in Arthur v. Texas & P. R. Co., 204 U.S. 505, 506, 27 S.Ct. 338, 341, 51 L.Ed. 590. In the latter case, substantially all the cotton received at Texarkana was loaded into cars at the compress platform. After the shipper procured receipts for the cotton from the compress company it was the practice of the shipper to go to the Railroad Company and surrender the compress receipts to the agent of the Railroad Company who in turn would then issue a bill of lading for the cotton acknowledging its receipt and agreeing to carry the same. In the Arthur case compression instructions were given by the Railroad Company to the compress and that would appear to be the main if not the only, distinction between the facts of the Arthur case and the instant one. As to the costs of compression, the facts seem not to have been fully developed, and the state of the record in that respect was appraised by the court in this language:

"Most probably the cost of compression and insurance was paid by the plaintiffs in the rate paid by them for the transportation of the cotton, as that cost was one of the factors which may be supposed to have entered into the rate of freight charged by defendant."

Nevertheless, under the circumstances so presented in the Arthur case, the Supreme Court held that a delivery to the Railroad Company prior to the destruction of the cotton by fire, which fire occurred after the issuance of the bill of lading, but before compression, was established as a matter of law, declaring itself on that point in this language:

"We think the evidence in this case made out a delivery to and acceptance by the railway company of the cotton in question, and that the compress company had the actual custody of the cotton as the agent of the railway company, and the question of whether the persons in whose custody it was at the time of the fire were guilty of negligence was a question which should have been submitted to the jury."

Obviously, the judgment in the Arthur case was reversed not on any question of agency, but solely on an issue of negligence that the trial court had taken from the jury.

So, it is obvious that the fact that the shipper in the case at bar paid the compression charges becomes immaterial under the undisputed facts of this case. Besides, it is in line with tariff regulations for the shipper to pay such fees. Also, the compress was held the agent of the Railroad Company, "although the cost of compression * * * originally paid by the railroad company, most probably * * * was paid by the shipper in the freight rate charged." It was there regarded as immaterial whether the shipper paid compress fees directly to the compress, or paid it indirectly through the railroad company.

On another phase of like undisputed testimony in the instant case, the Arthur opinion is pertinent wherein it holds "But when these receipts [the compress receipts] were handed by the plaintiffs to the defendant's agent, who took them and issued a bill of lading to the plaintiffs, the constructive possession and the entire control of the cotton passed to the defendant."

In the instant case, the appellant in its answer below alleged that it issued the bills of lading in question pursuant to the rules and regulations of the Railroad Commissioner of Texas, and quoted provisions thereof set out in an earlier part of this opinion. That pleading was based upon the rule which, in part, says: " * * * when satisfactory arrangements have been made by the shipper and the carrier, cotton may be tendered to the carrier upon compress platform and it shall be the duty of the carrier to receipt for the cotton in the same manner and on the same terms as it would receive and receipt for cotton if tendered at its own depot platform, at compress or non compress points." It was the defendant's contention that the rule of the Commission compelled the issuance of the bills of lading, etc. Such contention was rejected in the Arthur opinion in this language:

"We think the argument is not sound. The rule of the Texas commission applies to a case when the cotton is tendered to the railway company, although at the time it is upon the compress company's platform. Now, if the railway company did not regard the presentation of these receipts as in fact a tender to the railway company of the cotton in question, or if it were not a valid tender of the cotton, *it could have refused to sign the bill of lading.* * * * The company evidently regarded the cotton as tendered them, and issued the bill in acknowledgment of the fact of such tender." (Italics ours.)

The defendant insists that although it is logical to assume that the compress company was the agent of the Railroad in

the Arthur case, nevertheless in this one, since instructions to the compress to patch and consolidate the cotton, etc., were given by the owner or shipper, the compress company here became or remained the owner's agent. The opinion in Texas Midland R. Co. v. H. L. Edwards & Co., 56 Tex.Civ. App. 643, 121 S.W. 570, 574, writ refused, answers this contention. The facts of the Edwards and the instant case conform closely. Both are typical cases where cotton burned while on the platform of the compress. The practice and custom at Terrell (site of the Edwards case) at the time of the fire was for the shipper desiring to ship cotton on the compress platform to prepare a blank bill of lading based upon compress receipts previously issued by the compress company, identifying and describing the cotton. Such blank bill of lading was customarily submitted to the manager of the compress company who, after checking the cotton, placed his o.k. upon the bill which would then be presented to the agent of the Railroad Company for execution. The cotton would then be compressed, loaded and shipped. Edwards, desiring to ship his cotton, followed such procedure, prepared the blank bill of lading and presented it to the manager of the compress company for his approval. The manager approved it and Edwards submitted the blank approved bill of lading to the agent of the defendant, Railroad Company. The agent declined to execute the bill of lading because under the Railroad's agreement with the compress and under the ruling of the Railroad Commission the compress was required to keep sufficient insurance coverage to protect the Railroad against all bills of lading issued by it. This involved a matter strictly between the carrier and the compress company and was collateral to any rights of the shipper. While the manager of the compress was attempting to secure the additional insurance, and prior to the compression of the cotton, it was destroyed by fire. A judgment for Edwards was affirmed on appeal, the court holding "The facts show a delivery of the cotton to the railroad for transportation prior to the fire." This was the holding notwithstanding bills of lading had not been issued and some of the reasons for the court's conclusions are given in this language:

"The fact that the railroad company had no place to receive cotton intended for export shipment but the compress platform; that it had no employes for the handling of the cotton while on the platform, but accepted the O. K. of the superintendent of the compress as to the number of bales thereon, and relied on the compress company's employes to load the cotton in its cars—tends strongly to show, in our opinion, that in these respects the compress company and its superintendent were the agents of the railroad."

Further, the opinion in the Edwards case points out: "No complaint was made by the agent of the defendant company as to the checking of the cotton or O. K.'ing of the bills of lading by Flowers, and his only reason for not signing them was on account of the shortage of insurance" and then further observed:

"By the general usage the owner of cotton would give shipping instructions in writing to the compress company, and no shipping instructions were given to the agent of the railroad after such instructions were given to the compress company, and the compress company marked and tagged the cotton which was already on the platform, which had been localed in, according to such shipping instructions. * * * After this cotton was delivered to the compress company with shipping instructions no further instructions were given, either to the compress management or to the railroad with reference to the cotton by the owners thereof, and they had nothing further to do with the cotton in furtherance of its transportation."

The similarity of the facts in this and the Edwards case is striking, except that in the Edwards case no bills of lading had been issued by the carrier, as in this case. However, in each case it was the practice of the Railroad Company to accept cotton at the compress platform since it had no such platform of its own. In neither case did the Railroad have any employees present at the compress platform to handle cotton tendered it for shipment. In both cases the Railroad Company accepted the check of the superintendent of the compress company, relied upon him and his employees to weigh, identify and load the cotton into the cars. In both cases shipping instructions were given in writing by the shipper. The instant case, where bills of lading were issued without any stated reservation or qualification, is undoubtedly a stronger case for carrier's liability than the Edwards case.

The contention in the Edwards case that the Railroad was not liable as a carrier because there remained certain acts to be performed before the cotton was ready for shipment, and that prior to the performance of such act the cotton could not be and was not received for transportation, was disposed of in this language: "It is true that the cotton had not been compressed at the time of the fire, and this was necessary in foreign shipments, but it was understood that the cotton was delivered for immediate shipment as soon as it could be compressed; shipping instructions to that effect having been given the compress company."

The case of Wichita Valley R. Co. v. Golden, Tex.Civ.App., 211 S.W. 465, 466, illustrates in a different, or somewhat reverse, way the application of the rule of law upon which the compress company has been held to be the agent of the Railroad Company at the time of the fire. The point is presented by the following excerpt from the Golden case: "By article 6589, Vernon Sayles' Civil Statutes, appellant was required to erect at every station for the reception and delivery of freight suitable buildings to protect such freight from damages. A reasonable inference from the record is that in the absence of such a building having been erected by appellant at Seymour the cotton in question was unloaded upon the platform of the Seymour Compress & Ice Company. Under such circumstances the Seymour Compress [Company] & Ice Company was the agent of appellant, and not an independent warehouseman."

In this appeal the defendant, or appellant, supports its contention that the compress company at the time of the destruction of the cotton was not the agent of the Railroad Company, by the citation of Gulf, C. &. S. F. R. Co. v. Anderson, Clayton & Co., Tex.Com.App., 246 S.W. 1031 and Missouri Pac. R. Co. v. McFadden, 154 U.S. 155, 14 S.Ct. 990, 38 L.Ed. 944. These cases are distinguishable from the instant case on the facts and are not believed to be applicable or controlling.

In the Anderson, Clayton & Co. case the shipper at the time of the fire was attempting to procure a bill of lading on 100 bales of cotton, whereas there had been tendered the Railroad Company only 99 bales. The opinion of the Court of Civil Appeals (212 S.W. 814, 816) states: "Neither Nicholson & Baker, nor A. H. Carter, the representative of plaintiffs, nor the compress company on their behalf, made any request of the defendant railway company to proceed with the shipment of the 99 bales of cotton, or to issue any bill of lading for the 99 bales, until after the fire * * *.'''

That is, the shipper demanded bills of lading for 100 bales and tendered only 99. He was not entitled to a bill of lading on the entire shipment until the entire shipment was tendered. Consequently he had received no bill of lading when the fire destroyed the cotton.

It is pointed out that in that case the Railroad paid 2¢ per bale for loading. The true situation is reflected by these additional facts: The shipper paid 2¢ per bale for sampling; 3¢ per bale for weighing and 10¢ per 100 pounds for compressing. Hence, if a bale of cotton weighed 500 pounds this meant the shipper paid 55¢ to the compress company, while the Railroad paid 2¢ on each bale handled. In the light of these circumstances it would seem that the compressing of cotton was of mutual benefit to the shipper and the transportation company, and, therefore, of no special significance in determining the issue of liability under consideration.

In addition to the fact that no bill of lading had been issued in the Anderson, Clayton & Co. case, there was the further fact that the missing bale of cotton had not been inspected by a representative of the Western Weighing & Inspection Bureau. This element of inspection was appraised in the opinion of the Commission of Appeals in this language [246 S.W. 1032]: "* * * it is uncontroverted that it was the practice of the agent of the railway company to refuse to sign bills of lading until this inspection had been made." In the instant case, the Railroad Company proved no rule prohibiting the issuance of bills of lading before compression, etc.

The gist of the opinion in the Anderson case is stated in the first syllabus: "A carrier is not liable as an insurer of goods to be shipped until the entire quantity ordered to be shipped is delivered to and accepted by the carrier for immediate shipment by it." There is nothing surprising in the disposition made by the Supreme Court of the appeal in the Anderson case. It does not answer the questions arising on this appeal.

The opinion in Missouri Pac. R. Co. v. McFadden, 154 U.S. 155, 14 S.Ct. 990, 38 L.Ed. 944, is equally without controlling effect in the disposition of this appeal, as is manifest by the one and only syllabus to the opinion, viz.,

"If a railroad company, for its own convenience and the convenience of its customers, is in the habit of issuing bills of lading for cotton delivered to a compress company, to be compressed before actual delivery to the railroad company, *with no intention on the part of the shipper or of the carrier* that the liability of the carrier shall attach before delivery on its cars, and the cotton is destroyed by fire while in the hands of the compress company, the railroad company is not liable for the value of the cotton, so destroyed, to an assignee of the bill of lading without notice of the agreement and course of dealing between the shipper and the carrier." (Italics ours)

Also, the opinion in the McFadden case says:

"Many questions were discussed at bar which we deem it unnecessary to notice, as we consider that the whole case depends upon the correctness of the judgment of the court below in sustaining the [special] exception to the first defense in the amended answer. That defense averred that the cotton for which the bills of lading were issued was never delivered to the carrier; that, by a custom or course of dealing between the carrier and the shipper, *it was understood by both parties that the cotton was not to be delivered at the time the bills of lading were issued,* but was then in the hands of a compress company, which compress company was the agent of the shipper; and that it was the intention of the parties, at the time the bills of lading were issued, that the cotton should remain in the hands of the compress company, the agent of the shipper, for the purpose of being compressed, and that this custom was known to the plaintiffs and transferees of the bills of lading; and that, while the cotton was so in the hands of the compress company, the agent of the shipper, and before delivery to the carrier, it was destroyed by fire. [Italics ours]

"All of these allegations in the answer were, of course, admitted by the exception, and therefore the case presents the simple question of whether a carrier is liable on a bill of lading for property which, at the time of the signing of the bill, remained

in the hands of the shipper for the purpose of being compressed for the shipper's account * * *."

The court, discussing the significance of sustaining an exception amounting to such broad admissions, said: "Under these elementary principles we think there was manifest error below in maintaining [sustaining] the exception to the first count in the amended answer. Of course, in so concluding we proceed solely upon the admission which the exception to the answer necessarily imported * * *." Hence, we do not believe that opinion answers any of the questions propounded by this appeal, although some of the abstract principles of law announced find application in numerous cases coming under this type.

In Texarkana & Ft. Smith R. Co. v. Brass, Tex.Com.App., 260 S.W. 828, 833, the court concluded: "On the whole, there would seem, therefore, to have been no evidence with any probative force to rebut the prima facie case of delivery made by the acknowledgments in the bills of lading issued by defendant." After a careful study of this record, such is our conclusion in this case.

Appellant's propositions 1 and 2 are overruled.

The third proposition is that the evidence established that the plaintiff had been paid in full for any and all losses sustained by it, and had assigned its cause of action to a stranger in the suit. That the plaintiff no longer had any cause of action against this defendant, and that defendant was entitled to a judgment on this theory.

The plaintiff answers this contention by propositions, in substance, that the undisputed testimony showed that the plaintiff had not been paid for the loss for which it sues, and that it had received from its insurer under the provisions of an insurance contract merely a loan or conditional payment; that such loan or advance did not, by reason of the specific provisions of the insurance contract, inure in any way to the benefit of the defendant and that the testimony established as a matter of law plaintiff's legal right to the cause of action against the defendant, as well as his right and duty to institute and maintain this suit.

The facts upon which this contention is based are few and simple. The Railroad Company issued its bills of lading providing

it should have the benefit of insurance carried by the owner of the cotton, but the owner merely held a policy which stipulated that the insurer should have no liability if the cotton was shipped under a bill of lading giving the Railroad the benefit of the shipper's insurance, or if loss occurred under the facts placing liability upon the carrier. The insurance contract provided that pending determination of the facts and law relative to the carrier's liability (in a given case) the insurer would make a loan to the insured, repayable out of the ultimate recovery from the carrier. To effect recovery from the carrier the assured agreed to institute and prosecute suit in his own name and pay over the recovery to the insurer in satisfaction of the loan. In the instant case plaintiff's cause of action was transferred to the insurer as collateral for the repayment of such loan.

Under the terms of the policy there was to be no payment of any *recoverable loss* to the plaintiff (shipper) by the insurer. Neither was there an absolute assignment in the appellee's cause of action whereby ownership, legal or equitable, was conveyed out of the plaintiff to the insurance company.

When the cotton was destroyed September 18, 1935, the Railroad Company denied liability to the plaintiff who in order to have the benefit of the value of its cotton at once and without waiting for the determination of the Railroad's liability through court action, applied to its insurer for a loan. Such loan was made as evidenced by the written agreement of the parties, plaintiff and insurer. Such loan did not constitute payment to the plaintiff of its claim or cause of action, nor did it extinguish its legal or equitable ownership of the same. The loan did not subrogate the insurer to the cause of action against the Railroad so as to require suit to be brought in the insurer's name. Such questions have been settled adversely to the contention of defendant in the following cases: Luckenbach v. W. J. McCahan Sugar Ref. Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522; Gulf C. & S. F. R. Co. v. Zimmerman, 81 Tex. 605, 17 S.W. 239; Staple Cotton Co-op. Ass'n v. Yazoo & M. V. R. Co., 189 Miss. 387, 197 So. 828; Adler v. Bush Terminal Co., 161 Misc. 509, 291 N.Y.S. 435; Camden Fire Ins. Ass'n v. Eckel, Tex.Com.App., 14 S.W.2d 1020.

As said in the Luckenbach opinion [248 U.S. 139, 39 S.Ct. 55, 63 L.Ed. 170, 1 A.L.R. 1522], "The insurer could not have been obliged to pay until the condition of their liability—i.e., nonliability of the carrier—had been established. The shipper could not have been obliged to surrender to the insurers the conduct of the litigation against the carrier, until the insurers had paid."

Upon the authorities just cited, the appellant's third and fourth propositions are overruled.

The judgment of the trial court is affirmed.